# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION
## Civil Action No. 7:21-cv-061

TONYA BARBER,

          Plaintiff,

v.

COASTAL HORIZONS CENTER, INC.,

          Defendant.

**AMENDED COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff, Tonya Barber ("Ms. Barber" or "Plaintiff"), hereby complains and alleges against Defendant Coastal Horizons Center, Inc. ("Defendant" or "Coastal") the following:

## <u>INTRODUCTION</u>

1.      Ms. Barber brings this action against Defendant for violations of the False Claims Act ("FCA" - 31 U.S.C. § 3729 *et seq.*), the North Carolina False Claims Act ("NC FCA" - N.C. Gen. Stat. § 1-605, *et seq.*), the Fair Labor Standards Act ("FLSA" - 29 U.S.C. §§ 201 *et seq.*), the North Carolina Wage and Hour Act ("NCWHA" - N.C. Gen. Stat. §§ 95-25.1 *et seq.*), the North Carolina Retaliatory Employment Discrimination Act ("REDA"), N.C. Gen. Stat. § 95-241 *et seq.*, and for wrongful discharge in violation of public policy ("WDPP").

2.      Defendant harassed, retaliated against, and terminated Ms. Barber based on, *inter alia*, Ms. Barbers' opposition to the making of a false record, statement or claim by Defendant in connection with payments from the government and Ms. Barbers' reporting her concerns of

1

Defendant's actions both internally and to the government. Defendant also failed to pay Ms. Barber overtime wages for hours worked in excess of forty (40) in a week, failed to pay her for all hours worked, failed to pay her the prevailing minimum wage, and failed to pay Ms. Barber's earned wages when due on the regular payday. Defendant further retaliated against Ms. Barber because she complained of Defendant's wage payment violations.

## THE PARTIES

3.    Plaintiff Tonya Barber is a citizen and resident of the United States and North Carolina.

4.    Defendant Coastal Horizons Center, Inc. ("Defendant") is, and at all relevant times was, a non-profit corporation registered in the state of North Carolina. Defendant's principal office is located at 615 Shipyard Blvd, Wilmington, NC 28412. Defendant employed Ms. Barber from in or about 2016 through in or about January of 2021. Defendant acted by and through its managers, owners, and other agents.

## JURISDICTION AND VENUE

5.    This action arises under federal statutes, including the FCA and FLSA. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the claims brought herein constitute a federal question under the laws of the United States.

6.    This Court has supplemental jurisdiction over Ms. Barber's state law claims pursuant to 28 U.S. Code § 1367 because they arise out of the same circumstances as her federal claims and are based upon a common nucleus of operative fact.

7.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendant conducts business in this district and is subject to personal jurisdiction in this district for the purposes of this action.

## ADMINISTRATIVE EXHAUSTION

8.      Plaintiff satisfied her obligation to exhaust her administrative remedy by timely filing a retaliatory discrimination complaint with the North Carolina Department of Labor ("NCDOL") on or around May 5, 2021.

9.      On August 3, 2021, the NCDOL issued a right-to-sue letter and Plaintiff timely brings this action within ninety (90) days of her receipt thereof.

10.     Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

## FACTS

11.     In or about January of 2016, Ms. Barber was hired and began working for Defendant as a Case Manager.  Ms. Barber was hired on a full-time basis, with various benefits. She initially worked on Defendant's HUD Housing program for homeless individuals and families ("HUD housing program") and Defendant's Critical Time Intervention (CTI) program (a state program under the North Carolina Department of Health and Human Services).

12.     Ms. Barber's primary role at Defendant was to provide direct client services (to government program beneficiaries), while the upper-level decisions and financials for the program were supposed to be handled by program directors (various through the years) and Defendant's Finance Department, primarily Defendant's Controller, Jenifer Burns ("Burns").

13.     Ms. Barber's initial supervisor was Jessica Rasino, program director ("Rasino").

14.     In or about the first half of 2016, shortly after Ms. Barber began working for Defendant, Ms. Barber questioned Defendant's compliance (or lack thereof) with government regulations with respect to the government-funded programs she worked in.  She directly voiced her concerns and inquiries to Rasino.

15.     Throughout Ms. Barber's employment, various supervisors and managers of Defendant (including Rasino) responded to Ms. Barber's concerns about government compliance with hostility and attempted to prohibit Ms. Barber from further information instead of directly addressing her concerns.

16.     In or about July 2016, shortly after Ms. Barber raised concerns about Defendant's lack of regulatory compliance in government-funded programs (described *supra*), Ms. Barber was recommended for termination by Rasino and reduced from full-time to part-time (also losing full-time benefits).

17.     In or about September of 2016, Ms. Barber reported potential misuse of HUD grant funds to Rasino specifically regarding Defendant's use (or misuse) of product/service codes, which relate to the disbursement of HUD grant funds for specific and approved purposes.

18.     In or about Fall of 2016, after Ms. Barber's opposition to Defendant's potential misuse of government funds (described *supra*), Defendant began delaying Ms. Barber's pay (paying her 1-2 pay periods late as compared to other employees), arbitrarily reducing/modifying the hours Ms. Barber was permitted to work, and sometimes refusing to pay her for hours that she worked.  Defendant also directed Ms. Barber to use a separate process for submitting hours than other employees, in an apparent attempt to avoid the proper recording of her hours within Defendant's payment system(s).

19.     In or about 2017, Ms. Barber alerted the HUD Office of Inspector General (OIG) regarding her concerns of Defendant's potential financial misappropriation of government funds. Ms. Barber also spoke about her concerns to the HUD local field representative, Diane Dillahunt ("Dillahunt").   Dillahunt was the designated government representative and contact for Defendant's HUD housing program throughout Ms. Barber's employment.

4

20.     Throughout 2017 and into 2018, Ms. Barber continued trying to alert her supervisor Rasino that the HUD housing program was not operating according to HUD regulations. Rasino did not attempt to rectify Ms. Barber's concerns and instead responded with hostility (such as specifically excluding Ms. Barber from employee office functions) and making it more difficult for Ms. Barber to complete her work tasks.

21.     Like all recipients of HUD funding received through homeless assistance grants, Defendant was (and is) required to prepare and submit an Annual Performance Report (APR) for HUD every operating year.

22.     The APR can affect the amount of grant money a recipient may receive in following years and can result in HUD recapturing funds if they were not expended on approved expenses.

23.     In or about December of 2017, Defendant tasked Ms. Barber with completing and submitting the APR for the HUD program for Fiscal Year 2016-2017.

24.     From in or about December of 2017 through in or about January of 2018, while gathering information for the APR, Ms. Barber was provided several inaccurate financial reports directly by Defendant's Controller Burns. Burns was (and is) responsible for the actual withdrawal of HUD grant money by Defendant and paying of program expenses (which should only be for specific costs, as required by law and regulation). Based on Defendant's records (or lack thereof) and Ms. Barber's own personal knowledge of the HUD program, she believed the financial numbers given to her by Burns were significantly off and could not have been accurate. Defendant appeared to be claiming more in allowable expenses (to be paid by the government) than what Ms. Barber knew actually occurred.

25.     Between in or about December of 2017 and in or about January of 2018, Burns was unable to rectify the inconsistencies in Defendant's figures and, as a result, Ms. Barber was not

5

comfortable submitting an APR with false and inflated numbers to HUD. Ms. Barber brought her concerns to Kenny House, Defendant's Vice President of Clinical Services ("House"), and also discussed them with Bob Jalbert, Defendant's Human Resources Director ("Jalbert"). Both House and Jalbert assured Ms. Barber they would be "looking into" her concerns.

26.     In or about January of 2018, after raising concerns to House and Jalbert (discussed *supra*), Ms. Barber followed up with both of them multiple times to try and have the issues appropriately addressed. Despite the past assurance that her concerns would be "look[ed] into" (discussed *supra*), Ms. Barber had not been contacted by anyone at Defendant to fully understand the extent of issues she raised and Ms. Barber still did not have accurate figures to submit to HUD with the APR (which was soon due).

27.     In or about late January or early February of 2018, late in the evening, House called Ms. Barber on her cell phone and said it was her job to report the numbers given by Defendant's Finance Department (Burns) and, as Ms. Barber worried of her personal liability for submitting false numbers to the government, House said it would not "fall on" Ms. Barber if the numbers were incorrect. House admitted he had not even read Ms. Barber's detailed email about her concerns with the false APR figures. House asked Ms. Barber to submit the APR that same night and send him a confirmation email proving she had submitted it.

28.     In fear of losing her job, Ms. Barber submitted the APR for FY2016-2017 through the HUD reporting system and sent House an email confirming the submission.

29.     When Ms. Barber submitted Defendant's FY2016-2017 APR to HUD (described *supra*), unbeknownst to Defendant at the time Ms. Barber included a note for HUD in the "additional comments" section to tip them off to Defendant's financial inaccuracies in the APR. Dillahunt (HUD) later acknowledged receiving the note, which triggered HUD recapturing

6

approximately $18,117 in Defendant's grant funds from the FY2016-2017 operating year (upon information and belief, the first such funds recapture for the program). During preparation of the following two APRs to be submitted to HUD, Ms. Barber was specifically excluded from being involved (despite having the most institutional knowledge of the program and previously being tasked with APR preparation); House told Ms. Barber's supervisor that Ms. Barber was "not to have access to financial data or even ask questions to anyone about anything related to finances."

30.     On or about February 9, 2018, House and Jalbert met with Ms. Barber to discuss the concerns she was raising about inaccuracies in Defendant's financial data being submitted to HUD and, relatedly, her complaints of retaliation from supervisor Rasino. Instead of addressing Ms. Barber's concerns, House told Ms. Barber that she was not supposed to speak to anyone outside Defendant about the issues she raised regarding the false documents from Defendant's Finance Department, telling Ms. Barber to "stay in your lane" (which Ms. Barber perceived as a threat).[1] When Ms. Barber tried to explain her attempts to help Defendant rectify the discrepancies at issue with HUD, which were ongoing, she was told not to concern herself with that anymore. At the meeting, Ms. Barber was also told that she and the HUD housing program were being reassigned from Rasino to a new supervisor (Rachel Petrosky). Ms. Barber was told to immediately remove all personal and HUD housing program items from the building where Rasino was located; during this move, in apparent further retaliation, Rasino specifically prohibited coworkers from helping Ms. Barber move out the large amount of office and program material (despite Ms. Barber asking for help).

_____

[1] Despite the various threats Ms. Barber received from Defendant's management over the years, federal law and Defendant's own written employment policy permitted any employee (such as Ms. Barber) with information concerning allegedly unlawful conduct to contact the appropriate government agency.

7

31.     From in or about 2018 through in or about 2020, while Ms. Barber tried to get the HUD housing program into compliance and continued reporting her concerns to Defendant, Defendant sometimes reduced her hours and/or pay (also failing to properly compensate her for all time worked).  Despite only being paid as a part-time employee, Ms. Barber noticed on financial reports from Defendant to HUD that Defendant was still claiming the cost of Ms. Barber's employment (a HUD grant-eligible expense) as if she were working full time with benefits.

32.     In or about May of 2019, Eline Ricci ("Ricci") became the program director over the HUD housing program and Ms. Barber's supervisor.

33.     From in or about May of 2019 through the end of Ms. Barber's employment (described *infra*), under Ricci's supervision, Ms. Barber continued trying to address the issues of improper reporting and financial operations of the HUD housing program.  Ms. Barber continued to be met with retaliation and hostility, including through pretextual written discipline.

34.     From in or about August of 2019 through the end of Ms. Barber's employment, Ms. Barber began regularly reporting her serious concerns about Defendant's operation and finances of the HUD housing program to HUD representative Dillahunt.

35.     On or about June 25, 2020, Barber and Ricci learned that Burns recently withdrew all remaining HUD housing program grant funds without request from the housing program itself (i.e., Ms. Barber and Ricci, the program director) and without itemized justification to show the money was being spent on an appropriate and legal purpose.  On June 25, 2020, Ms. Barber emailed Ricci her exasperation and continued concerns of financial mismanagement, stating in part:

> I am trying to find the words to explain the level of frustration and disbelief that I have right now.  This payment voucher is ONLY a request by [Burns] to draw down the funds of $19,766.65 from the Supportive Services budget line of the HUD PSH grant that only supports our program…on June 17th, 2020 [Burns] went into the HUD system and

submitted this request to draw down every last penny in our eLOCCS account to be deposited into [Defendant's] account by June 19, 2020…All our money.

The housing department had submitted a check request for an approved Support Service expenditure on May 8th, 2020 for approximately $10,000 only for us to fund out AFTER [Burns] submitted a request ON HER OWN with NO request for it from the housing department to pull out all of the money in the grant and therefore denying an approved program cost/request.

The housing department did NOT request anything that totals the amounts that [Burns] drew down from the Support Services budget on June 17th, 2020 and I fully believe that this is not an isolated incident.

[Ms. Barber concluded with the following:]
**There [have] been constant attempts to navigate around showing where the money is being drained into and why.  This is inappropriate and shows a consistent pattern of mismanagement of Federal funds at best.** (emphasis added)

36.     On June 25, 2020, in response to Ms. Barber's allegations of "a consistent pattern of mismanagement of Federal funds at best" (described *supra*), Ricci's response acknowledged Ms. Barber's concerns as serious and valid, stating in part: "I know, I pushed back and got told no by her [Burns].  At this point will be reaching out to Kenny [House] regarding this…I was very frustrated when these emails [from Burns] came through and part of me just wanted to throw my hands in the air and just scream."

37.     On June 25, 2020, in the same email chain discussing Burns' likely mismanagement of federal funds (described *supra*), Ricci made clear to Ms. Barber that Ricci believed her own personal actions may also one day come under scrutiny: "Truthfully I feel that last year we protected [Burns] during the audit [by HUD].  I am saving all the emails so that if I have to show what we did to try and be in compliance I can share them with whomever.  I'm not putting my neck out to get chopped for someone else's failure."

9

38.     From June through August, 2020, Ms. Barber continued trying to resolve the financial discrepancies in Defendant's HUD housing program, reporting concerns both internally and with representative Dillahunt.  Despite Ricci's June 25th email referencing Ricci's own concerns and desire to involve VP House (described *supra*), Ms. Barber was not made aware of any meaningful efforts by House or other executives to help resolve the HUD housing program issues.

39.     On or about August 27, 2020, Ricci sent an email to Ms. Barber (with House copied) directing her to stop any communications with Defendant's designated HUD representative, writing: "I need you to stop having any discussions with Diane [Dillahunt from HUD]."  For months, Ricci had known about Ms. Barber's serious concerns involving Defendant's HUD housing program (which Ricci previously agreed with, discussed *supra*) and knew Ms. Barber was in regular contact with Dillahunt, the program's assigned HUD representative.

40.     On or about September 8, 2020, Ricci (with House also in attendance) gave Ms. Barber a "Written Reprimand" regarding Ms. Barber's "recent communications with HUD and Diane Dillahunt."  The document specifically prohibited Ms. Barber from talking to HUD about financials and stated that **"your personal beliefs or opinion of how [Defendant] is managing the HUD funds and program are not to be communicated with any outside agencies or representatives."** (emphasis added).  On the document, Ricci copied House (Vice President of Clinical Services) and Jalbert (Defendant's Human Resources Director), both of whom were involved in threatening Ms. Barber years earlier when she was told to "stay in your lane" and not speak to anyone outside Defendant about the issues Ms. Barber raised regarding false numbers in the APR being submitted to HUD (described *supra*).

41.     On or about September 8, 2020, in the same meeting Ms. Barber was issued a Written Reprimand for speaking to HUD (*supra*), Ms. Barber directly told House that she believed "fraud" was being committed by Defendant and others within the company were just ignoring it.

42.     On or about September 16, 2020, House re-issued the "Written Reprimand" to Ms. Barber in an attempt to support the discipline with new, pretextual justifications (instead of directly disciplining Ms. Barber for reporting her concerns to HUD, as described *supra*).[2]  The document from House included the following: "You [Ms. Barber] have recently expressed your opinion that [Defendant], or someone at [Defendant], has committed fraud with respect to the handling of HUD funds.  For the sake of clarification, you are *not* being reprimanded for expressing this belief, either internally or externally.   To the contrary, we appreciate your bringing your concerns to our attention.  We are addressing those concerns and may request more information from you as we do so." (emphasis in original).  As in the past (described *supra*), House gave Ms. Barber no reason to believe a legitimate, thorough investigation would actually be conducted into the financial issues of the HUD housing program.

43.     On or about September 16, 2020, Ms. Barber elevated the matter by complaining in writing directly to Defendant's President and Chief Executive Officer, Margaret Weller-Stargell ("Weller-Stargell"), as well as two of Defendant's board members: Andy Jones (Board of Trustees Chair) and Colin Hackman (Board of Trustees Vice-Chair).  Ms. Barber's lengthy complaint was titled "Reporting of Dishonest or Fraudulent Activities per [Defendant] Policy" and described her "significant, long term" concerns "around activities carried out by the Finance Department, specifically Jenifer Burns, and the irregularities surrounding Jenifer's handling of the HUD Grant funds."  Ms. Barber detailed years of her "pointing out that [Defendant's] HUD housing program

---

[2] As on other occasions, again Defendant unjustly questioned and scrutinized Ms. Barber's hours and pay in retaliation. Tellingly, the new justifications were wholly absent from the initial Written Reprimand.

was not operating according to the HUD regulations," and the resultant retaliation and threats she had received within Defendant, including House in 2018 calling Ms. Barber's personal cell phone late in the evening and directing Ms. Barber to submit an APR to HUD despite the numbers being "significantly off" (described *supra*). Ms. Barber concluded with (*sic*):

> I am at a loss of how to proceed in good faith with Eline [Ricci] as my supervisor and the Program Director, the finance documents not being accurately corrected still, the stress brought on by being targeted by [Ricci] for inaccurate written reprimands that also appear to violate [Defendant's] own policy manual as well as the lack of interest in finding out the details of this entire situation from upper-level management and the knowledge that HUD still has outstanding concerns about [Defendant's] actions that will likely "cause the program to no longer be viable." This means that if we lose the funding, it will impact our current residents, myself as my position would be eliminated due to the failures of [Defendant] to move into compliance with HUD. The money awarded to this program annually is then lost to the entire community who is working so hard to combat homelessness, especially in a global pandemic. Despite knowing that I have done everything in my power to try and correct the issues at hand, I am still so emotionally stressed out it is negatively impacting my daily life from sleep, appetite, gastrointestinal complications, mood, ability to focus on work tasks, my confidence in representing my company during the numerous weekly meetings in the community, and much more. Despite knowing that none of the information about the concerns I have had, described above, have ever been well received within [Defendant], **I still feel it is vital to continue to do the right thing by reporting the fraudulent activity** and the concerns regarding my treatment as an employee trying to do the right thing. (emphasis added)

44.     Following Ms. Barber's September 16, 2020 written complaint to Defendant's CEO and Board Members (described *supra*), Ms. Barber spoke at length with Defendant's auditors to detail her concerns, after which the auditors agreed better oversight was needed. Following these findings, completed by Defendant's usual financial auditors, Defendant was advised to hire an outside investigator for a deeper investigation.

45.     From in our about late December of 2020 through in or about early January of 2021, Ms. Barber worked at length with the outside investigator hired by Defendant to further examine the financial issues she had been raising. The outside investigator reported his findings to

Defendant's CEO (Weller-Stargell) and Board in early January 2021; however, Ms. Barber was not made aware of his full findings. Throughout Ms. Barber's extensive conversations with financial experts concerning Defendant's conduct (with respect to the HUD housing program), she was not given any cause to believe her concerns were unfounded.

46.     On or about January 5, 2021, during a HUD housing program discussion about the need to cease rent payment for a unit being vacated by a program beneficiary, Burns disclosed to Ms. Barber that Defendant was still paying the lease on a second unit with that same facility (Wilmington Housing Finance and Development, "WHFD"). Burns said the last program beneficiary in the second unit was an individual who Ms. Barber knew had moved out in 2017. In this one instance, Defendant appeared to have expended approximately $30,000 of HUD grant funds to pay the lease on a unit for over three (3) years, despite it not housing any beneficiaries of the HUD housing program.

47.     On January 5, 2021, Ms. Barber addressed Burns' revelation of wasted HUD grant funds (described *supra*) with an email to Burns and other members of Defendant's upper-management, including House, Bill Van Lew (Defendant's Chief Financial Officer [CFO], "Van Lew"), and Defendant's President/CEO Weller-Stargell; Ms. Barber reported the "gross mismanagement of funds," stating in part (*sic*):

> I'm at a loss for words. [The last beneficiary] was exited 6/2017 while Jessica [Rasino] was still the Program Director. No one moved in after him to that unit.
>
> I spent 2 hours yesterday returning emails, texts, phone calls to people to turn them away for housing because of all the issues our housing program continues to have. I sat through the regular weekly staffing this morning as the Coordinated Entry Committee reviewed well over 100 names of homeless individuals and families and [I] confirmed once again that Coastal could not take more homeless clients because we are "at capacity".
>
> I have spent countless hours over the last five years trying to communicate to everyone above me that things just are not correct internally for this program. This is exactly why

13

HUD specifies that a TEAM of people is registered and operating in eLOCCS [the HUD grant money dispersal system]. The case manager submits the monthly requests for funds, each a single funds request that's labeled to what client/unit/service. Then the Program Director/Supervisor is notified of the funds requests. It's denied or processed further based on the supporting documents with each and every funds request as an approved/allowable expense or not. Those that are approved then get pushed up to the dedicated person in Finance to submit to HUD for approval. Then it's paid out if approved and paid to the appropriate party and an actual receipt is collected and filed. For every single funds request.

This further confirms that there is gross mismanagement of funds along with a dangerous lack of oversight for ALL employees.

I cannot process that going into 2021 that these types of "errors" are continuing to occur every month. I cannot process the amount of money granted to us to be good stewards of and pour into assisting our communities most vulnerable populations and instead the money is mismanaged left and right.

I do not have the amount of hours needed, nor am I being compensated adequately to in essence take all the trainings for all the job descriptions required for [Defendant] to operate a PSH [HUD permanent supportive] housing program, point out all the visible errors year after year, receive write up after write up that I don't follow chain of command, that I should not communicate directly with Finance or HUD, be tasked with training my own supervisors on their responsibilities regarding housing program operations, try to provide relevant and accurate feedback to other staff involved, AND handle the housing caseload of clients who are in PSH housing because of their incredibly high need for intensive case management.

I do not know what more to say at this time. I'm so disappointed that this is happening and the true impact on my community is unknown but created by whatever this "culture" at [Defendant] is that enables placing people in charge of important duties on a day to day basis that have not only inadequate training but a clear position of indifference on obtaining the proper training to execute their duties.

It's 2021. What are we, as an agency that accepted the position of being a legitimate housing provider, going to do to change everything we have been refusing to acknowledge that we are not doing?

I'm lost here. I don't know what to do but I'm not okay with telling people [homeless individuals and families] every day that we can't house them because we are at (insert whatever here).

14

48.     On or about January 8, 2021, Defendant held a conference call to discuss the issues raised in Ms. Barber's January 5th email (*supra*) with CEO Weller-Stargell, CFO Van Lew, Burns, House, Ricci, and Ms. Barber.  During the call, Burns contended she had been confused about the name of the HUD housing program beneficiary that Defendant was making lease payments for to WHFD[3], while also acknowledging that Defendant <u>did</u> make lease payments (with HUD grant money) for a unit that was not occupied (although according to Burns the payments spanned several months, not years).  Ms. Barber reiterated that it was against HUD policy to be paying for an empty unit for any number of months, and again pointed out Defendant's failure to comply with HUD regulations concerning financials.

49.     On or about January 9, 2021, Ms. Barber forwarded the emails between her and Burns from January 5th regarding Defendant expending HUD funds improperly (described *supra*) to Dillahunt (HUD).

50.     On January 11, 2021, Ms. Barber reported to Dillahunt (HUD) what happened during Defendant's recent conference call (described *supra*), including the fact that Defendant (Burns) admitted to improperly paying multiple months of a lease with HUD grant money.  Ms. Barber also reported other improper expenditures by Burns with respect to HUD grant money.

51.     On January 11, 2021, Dillahunt (HUD) emailed Ms. Barber twice to inform her of developments concerning the recent issues Ms. Barber had relayed to her.  That same day, Dillahunt spoke with CEO Weller-Stargell and told her that Dillahunt was requesting HUD technical assistance for Defendant.  Dillahunt told Ms. Barber: "I am going to put a freeze on

---

[3] According to Burns, Defendant paid WHFD for two units, but the actual address of the units changed over time, leading to her confusion as to what units were being paid for (with HUD grant funds) and for whom.  As Ms. Barber explained, if Defendant properly complied with HUD financial regulations and guidance, the issue and Burns' purported confusion may easily have been avoided.

drawing down any rental assistance funds." Dillahunt told Ms. Barber that she was escalating Ms. Barber's concerns of financial mismanagement and that HUD would be investigating the matter further. The financial repercussions on Defendant would be imminent, with Dillahunt saying, in part (*sic*):

> I am going to tell the TA [technical assistance] provider about the miss management of HUD funds and I know the agency [Defendant] will have to reimburse HUD for the funds that were paid to WHFD. **I am suspending the grant funds as of today** and requesting from [Burns] a list of the rents she paid to WHFD. (emphasis added)

52. On January 11, 2021, Dillahunt (HUD), in furtherance of HUD's investigation (described *supra*), also requested Ms. Barber provide Dillahunt with specifics regarding the rental payments Defendant made to WHFD: "Would you please send me a list of the rental units and clients that occupied those units at WHFD. I need the time frame, amount paid for each unit and how long, address of the unit and when the client moved in and out of the unit."

53. On January 12, 2021, Ms. Barber provided Dillahunt (HUD) with information requested the day prior (described *supra*) and provided additional context to explain the failures of Defendant's financial operations with respect to HUD grant money (while still trying to come up with possible solutions that may save Defendant's HUD housing program for the community).

54. Between January 11 and January 13, 2021, Defendant's HUD housing program failed to provide timely payment on a storage unit needed by a program beneficiary. The beneficiary and family were forced to return multiple times to the storage facility, however Burns failed to complete payment so that the moving could commence (despite Ms. Barber's repeated attempts to facilitate a smooth transition).

55. On January 13, 2021, Ms. Barber emailed Defendant's upper management (including CEO Weller-Stargell, House, Burns, Van Lew, and Ricci) to report the issue while Ms. Barber continued trying to ensure appropriate services for the program beneficiary, in compliance

with HUD policies and objectives. On the same email, Ms. Barber blind copied (bcc'd) Dillahunt (HUD) to continue her reporting of financial mismanagement of HUD funds (which Dillahunt was actively investigating, discussed *supra*). Ms. Barber wrote, in part:

> Several attempts to reach Jenifer [Burns] for payment were made… none were successful. The client [beneficiary] left, again, without an assigned storage unit and feeling more stress and panic. Today at 2pm the client reached out to me upset as the storage company had continued to reach out but still… on the third day of attempting… was not successful. The move is tomorrow, and all of their belongings are supposed to be moved to [a] storage unit…I cannot begin to explain how stressed out, justifiably, that this family is in seeing that [Defendant] Coastal Horizons has not prioritized them and supported them during this difficult transition.

> I want to say that this feels like an isolated incident of poor communication and failure of duties by Jenifer, but I cannot say that with any ounce of confidence… I am also requesting that this incident be remembered and factored into all the relevant situations prior that involved Jenifer Burns to either complete a financial transaction timely or provide confirmation and reports of transactions that are approved by HUD as well. There is a very clear and consistent pattern of neglect of duty that happens when tasks reach Jenifer or she is put in charge of the project/task completion.

56. On January 14, 2021, Dillahunt (HUD) replied to Ms. Barber's email of January 13, 2021 (described *supra*), writing to all of Defendant's management (CEO Weller-Stargell, House, Burns, Van Lew, and Ricci) regarding Defendant's delayed disbursement of HUD grant funds, also notifying Defendant's management of further action by HUD to investigate, writing (*sic*):

> Does the storage company have a website that [Burns] can make the payment. Remember, [Burns] has to have support documentation for all CoC [HUD] funds used.

> Also, HUD is requiring that the fees for the storage unit be paid ASAP so the client can have a place to store their belongings while looking for housing. This back and forth that you guys do are unacceptable to HUD and my cause you to lose CoC funds.

> I am requesting another on-site monitoring of the financial & programmatic for Coastal by [HUD] Headquarters because there is too much conflict with managing the program.

17

Please let me know when the storage unit is paid for and the client is able to store their belonging while [Defendant] Coastal locate other housing for them.

57.     On January 14, 2021, Ms. Barber emailed Dillahunt (HUD) and offered to provide further documentation regarding rental payments at WHFD to aid in HUD/Dillahunt's investigation (into the improper lease payments Ms. Barber had alerted Dillahunt of the week prior, discussed *supra*).

58.     On January 19, 2021, Defendant informed Ms. Barber she was being terminated; Defendant's termination letter stated[4]:

On January 13, 2021, you sent an email to Kenny House, Jenifer Burns, Bill Van Lew, Eline Ricci and Margaret Weller-Stargell. In that email, you were very critical of Jenifer and accused her of neglect with respect to a particular client's situation as well as an overall pattern of neglect regarding her duties. It was inappropriate for you to broadcast your criticisms of Jenifer in the manner in which you did.

While this internal communication itself is cause for concern, it soon thereafter came to our attention that you also surreptitiously included HUD representative Diane Dillahunt on your email (apparently by bcc). Your email prompted Ms. Dillahunt to reply to everyone, stating in writing that Coastal Horizons may be subject to increased scrutiny and/or loss of funding.

Upon further investigation, we found that the clients referenced in your January 13th email were in fact well-served and very appreciative for the aide our agency rendered them. So, while your January 13th communication would have been improper and egregious even if true, it is even more so now that it has turned out to be largely unfounded.

Your actions have placed this Agency, and particularly the very program for which you work, in jeopardy, and your employment is being terminated as a result. (Exhibit A)

59.     Defendant's letter makes the motive to end Ms. Barber's employment clear and unequivocal: she was terminated for reporting suspected mismanagement and waste to the

---

[4] Attached as Exhibit A.

government (after she raised similar concerns internally for almost five [5] years). In the days leading up to Ms. Barber's termination, HUD had begun actively investigating Defendant's waste and mismanagement of public funds, based on information relayed by Ms. Barber – and Defendant had just become aware that HUD funds may be lost. The other justifications detailed by Defendant in the termination letter were directly linked to the same protected action of Ms. Barber and clearly pretextual, considering:

    a. Defendant claimed that Ms. Barber's email detailing Burns' "overall pattern of neglect regarding her duties" was "cause for concern," even as an "internal communication," however, Ms. Barber had voiced extremely similar complaints about Burns' role in the HUD housing program to Defendant's management on many occasions previously, to no avail, and her concerns remained in good faith and justified (described *supra*); and

    b. Defendant claimed that Ms. Barber's "communication would have been improper and egregious even if true, it is even more so now that it has turned out to be largely unfounded" because (according to Defendant) the program beneficiaries at issue "were in fact well-served and very appreciative for the aide our agency rendered them," *however*, the beneficiary (and family) were distressed and not provided for until Ms. Barber escalated the issue involving Burns to Defendant's higher-management and HUD; afterwards the beneficiary profusely thanked Ms. Barber's efforts specifically.

60. Upon information and belief, in further retaliation for Ms. Barber's protected complaints regarding Defendant to HUD, after the termination of Ms. Barber's employment, Defendant has further sought to discredit and harm Ms. Barber and her reputation in the

19

community, including by providing deliberately negative and false references to prospective employers from whom Ms. Barber has attempted to obtain new employment.

61.     Based on the foregoing actions (and others), Ms. Barber believes and avers that Defendant subjected her to ongoing harassment, the loss of pay and benefits, and termination because Ms. Barber opposed the making of a false record, statement or claim by Defendant in connection with payments from the government, reported her concerns of Defendant's actions to the government, and assisted in a government investigation into Defendant's financial waste and mismanagement.

62.     Based on the foregoing actions (and others), Ms. Barber believes and avers that Defendant subjected her to ongoing harassment, the loss of pay and benefits, and termination because Ms. Barber opposed Defendant's unlawful wage payment practices.

### FIRST CLAIM FOR RELIEF
### The False Claims Act ("FCA" - 31 U.S.C. § 3729 *et seq.*)
### (Retaliation)

63.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

64.     The FCA imposes liability on those who knowingly present (or cause to be presented) a false or fraudulent claim for payment or approval, as well as those who knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.

65.     The FCA anti-retaliation provision prohibits an employee from being discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment for the employee's actions to stop or oppose an FCA violation.  31 U.S.C. § 3730(h).

20

66.     During all times relevant to this action, Defendant received funding from the federal government, including from the U.S. Department of Housing and Urban Development (HUD).

67.     Dating back to 2016, throughout Ms. Barber's approximate five (5) years of employment with Defendant, she raised numerous good faith concerns of Defendant's failure to abide by HUD regulations regarding financial record-keeping and expenditures, first reporting her concerns internally to Defendant and then externally to HUD beginning in or about 2017 (including to the HUD OIG and the HUD local field representative). Ms. Barber raised concerns to prevent Defendant from making false claims to the government and from otherwise abusing and wasting government funds allocated for the specific purpose of aiding homeless individuals and families.

68.     Dating back to 2016, in response to Ms. Barber raising concerns (described *supra*), Defendant subjected her to retaliation and harassment, including (but not limited to): lost full-time employment, lost benefits, lost wages (through the reduction of Ms. Barber's hours and refusal to pay her properly for all hours worked), unjust disciplines, and attacks against her reputation in the community.

69.     Shortly before her termination, Ms. Barber made reports to HUD of Defendant improperly spending funds in connection with a housing lease, which caused HUD's representative (Dillahunt) to open an investigation into Defendant.

70.     Ms. Barber was directly terminated for her reports to HUD (described *supra*), after Defendant was notified of HUD's intention to conduct further on-sight investigation and that HUD funds may be lost as a result.

71.     Defendant's retaliatory actions, sustained over years, have caused Ms. Barber significant and demonstrable mental, emotional, and physical harm, including through the

aggravation of medical conditions, loss of sleep, and overall negative impact on her health and wellbeing.

72.     Defendant's conduct constituted retaliation in violation of the FCA's anti-retaliation provision.

**SECOND CLAIM FOR RELIEF**
**North Carolina False Claims Act ("NC FCA" - N.C. Gen. Stat. § 1-605, *et seq.*)**
**(Retaliation)**

73.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

74.     The NC FCA imposes liability on those who knowingly present (or cause to be presented) a false or fraudulent claim for payment or approval, as well as those who knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.

75.     The NC FCA anti-retaliation provision prohibits an employee from being discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment for the employee's actions to stop or oppose a NC FCA violation.  N.C. Gen. Stat. § 1-613.

76.     Starting at the beginning of Ms. Barber's employment, in addition to Defendant's HUD housing program, Ms. Barber worked on a state-funded program of Defendant (CTI).

77.     During her employment, Ms. Barber voiced good-faith opposition and concerns about Defendant's compliance with regulations involving funding and expenditures for at least one state-funded program.

78.     After Ms. Barber opposed and sought to stop a possible FCA violation, Defendant subjected her to retaliation and harassment, including (but not limited to): lost full-time

employment, lost benefits, lost wages (through the reduction of Ms. Barber's hours and refusal to pay her properly for all hours worked), unjust disciplines, attacks against her reputation in the community, and termination.

79. Defendant's retaliatory actions, sustained over years, have caused Ms. Barber significant and demonstrable mental, emotional, and physical harm, including through the aggravation of medical conditions, loss of sleep, and overall negative impact on her health and wellbeing.

80. Defendant's conduct constituted retaliation in violation of the NC FCA.

<strong><u>THIRD CLAIM FOR RELIEF</u></strong><br>
<strong>Fair Labor Standards Act ("FLSA" - 29 U.S.C. §§ 201 <em>et seq.</em>)</strong><br>
<strong>([1] Failure to Pay Overtime; [2] Failure to Pay Minimum Wage; and [3] Retaliation)</strong>

81. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

82. The FLSA requires employers to pay non-exempt employees 1.5 times the employee's regular rate of pay for all hours worked in excess of forty (40) hours during any workweek.

83. The FLSA requires employers to pay non-exempt employees at least minimum wage for all hours worked ($7.25 an hour during the period in question).

84. During all relevant times, Defendant qualified as an employer under the FLSA.

85. During all relevant times, Ms. Barber qualified as a non-exempt employee under the FLSA.

86. For various weeks throughout her employment (including, but not limited to between 2018 and 2020), Ms. Barber worked in excess of forty (40) hours during a workweek.

87. Defendant never paid Ms. Barber any overtime compensation.

88.     For various weeks in or about 2018 and 2019, Defendant failed to pay Ms. Barber at least the prevailing minimum wage for all hours worked.

89.     Ms. Barber raised concerns with Defendant (including, but not limited to House) about being underpaid and that she was sometimes working more hours than she was being compensated for (including working over 40 hours a week during some weeks).

90.     Defendant's actions constituted violations of the FLSA and were done willfully.

**FOURTH CLAIM FOR RELIEF**
**North Carolina Wage and Hour Act ("NCWHA" - N.C. Gen. Stat. §§ 95-25.1 *et seq.*)**
**([1] Failure to Pay Overtime; [2] Failure to Pay for All Hours Worked on Regular Payday;**
**[3] Failure to Pay Minimum Wage)**

91.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

92.     The NCWHA requires every employer to pay each employee who works longer than forty (40) hours in any workweek at a rate of not less than time and one half of the regular rate of pay of the employee for those hours in excess of forty (40) per week.

93.     The NCWHA requires every employer to pay every employee all wages and tips accruing to the employee on the regular payday.

94.     The NCWHA requires employers to pay employees at least minimum wage for all hours worked ($7.25 an hour during the period in question).

95.     During all relevant times, Defendant qualified as an employer under the NCWHA.

96.     During all relevant times, Ms. Barber qualified as an employee under the NCWHA.

97.     At various times throughout her employment (including, but not limited to between 2018 and 2020), Ms. Barber worked in excess of forty (40) hours during a workweek.

98.     Defendant never paid Ms. Barber any overtime compensation at a rate of time and one half of Ms. Barber's regular rate of pay.

24

99. At various times throughout her employment (including, but not limited to between 2018 and 2020), Ms. Barber performed work for Defendant that was not compensated on the regular payday.

100. At various times throughout Ms. Barber's employment (including, but not limited to between 2018 and 2020), Defendant failed to properly compensate Ms. Barber at her agreed-upon and promised rate for all hours worked.

101. For various weeks in or about 2018 and 2019, Defendant failed to pay Ms. Barber at least the prevailing minimum wage for all hours worked.

102. Defendant's actions constituted violations of the NCWHA and were done willfully.

### FIFTH CLAIM FOR RELIEF
**North Carolina Retaliatory Employment Discrimination Act
("REDA" - N.C. Gen. Stat. § 95-240 *et seq.*)**

103. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

104. At all relevant times, Plaintiff was an "employee" of Defendant as that term is defined by REDA.

105. At all relevant times, Defendant was, and is a "person" as the term is defined by REDA.

106. During her employment with Defendant, Plaintiff (i) filed a claim or complaint, (ii) initiated an inquiry, investigation, inspection, or proceeding and (iii) testified or provided information to a person regarding wage payment violations.

107. One or more of the wage payment violations, specifically unpaid overtime, Plaintiff complained of, if true, would constitute a violation of the North Carolina Wage and Hour Act ("NCWHA").

108.     During her employment, Plaintiff was subject to retaliation for complaining of wage payment violations.

109.     Plaintiff was terminated in retaliation for engaging in protected activity concerning Defendant's wage payment practices.

110.     As an actual, proximate, and foreseeable consequence of Defendants' conduct, Plaintiff has suffered lost income, emotional distress, anxiety, humiliation, expenses, and other damages and is entitled to recover compensatory damages in an amount to be determined at trial.

111.     Defendants' actions were done maliciously, willfully or wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result of Defendants' conduct, Plaintiff is entitled to recover treble damages in an amount to be determined at trial.

112.     Defendants' officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above.

## SIXTH CLAIM FOR RELIEF
### Wrongful Discharge in Violation of Public Policy ("WDPP")

113.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

114.     The public policy of North Carolina, as set forth in the NCWHA, N.C. Gen. Stat. § 95-25.1 et seq. states, "[t]he wage levels of employees, hours of labor, payment of earned wages, and the well-being of minors are subjects of concern requiring legislation to promote the general welfare of the people of the State without jeopardizing the competitive position of North Carolina business and industry. The General Assembly declares that the general welfare of the State requires the enactment of this law under the police power of the State."

26

115.    Defendant violated the public policy of North Carolina by terminating Plaintiff because she complained about wage payment violations. Such conduct by Defendant is injurious to the public policy of the State of North Carolina.

116.    The public policy of North Carolina, as set forth in the REDA, N.C. Gen. Stat. § 95-240 *et seq.* states, "[n]o person shall discriminate or take any retaliatory action against an employee because the employee in good faith does or threatens to [engage in protected activity]."

117.    Defendant violated the public policy by retaliating and terminating Plaintiff after she exercised her rights and engaged in protected activity. Such conduct by Defendant is injurious to the public policy of the State of North Carolina.

118.    As an actual, proximate, and foreseeable consequence of Defendant's conduct, Plaintiff has suffered lost income, emotional distress, anxiety, humiliation, expenses, and other damages and is entitled to recover compensatory damages in an amount to be determined at trial.

119.    Defendant's actions were done maliciously, willfully or wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result of Defendant's conduct, Plaintiff is entitled to recover punitive damages in an amount to be determined at trial.

120.    Defendant's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff Tonya Barber respectfully requests that this Court enter judgment in her favor and grant her the following relief:

1.  Order Defendant to compensate Ms. Barber, reimburse her, and make her whole for any and all pay and benefits Ms. Barber would have received had it not been for Defendant's

illegal actions, including but not limited to back pay, front pay, salary/pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

2. Order Defendant to reinstate Ms. Barber to the same seniority status she would have had but for Defendant's conduct;

3. Award Ms. Barber two times the amount of back pay, interest on the back pay, and compensation for all special damages sustained as a result of Defendant's conduct;

4. Award Ms. Barber damages for her emotional distress and loss of standing in the community, in an amount to be determined by jury;

5. Award Ms. Barber unpaid back wages, minimum wage, and overtime compensation, plus liquidated damages equal in amount to the unpaid compensation;

6. Order Defendant to pay punitive damages to punish Defendant for its willful, deliberate, malicious, and outrageous conduct, and to deter Defendant or other employers from engaging in such misconduct in the future;

7. Order Defendant to pay treble damages to punish Defendant for its willful, deliberate, malicious, and outrageous conduct, and to deter Defendant or other employers from engaging in such misconduct in the future

8. Award Ms. Barber all reasonable costs and attorneys' fees incurred in connection with this action;

9. Award Ms. Barber injunctive relief to prohibit Defendant's further unlawful conduct in the future;

10. Award Ms. Barber prejudgment and postjudgment interest at the highest rates allowable by law;

11. Award Ms. Barber such other and further equitable and legal relief as appropriate under the circumstances; and

12. Grant Ms. Barber a trial of this matter by a jury.

## JURY TRIAL DEMAND

Plaintiff Tonya Barber demands a trial by jury for all issues of fact.

This the _____ day of _____, 2021.

/s/_____
L. Michelle Gessner (NC Bar No. 26590)
Nicole K. Haynes (NC Bar No. 47793)
GESSNERLAW, PLLC
1213 Culbreth Drive, Suite 426
Wilmington, North Carolina 28405
Telephone: (704) 234-7442
Facsimile: (980) 206-0286
E-Mail: michelle@mgessnerlaw.com
            nicole@mgessnerlaw.com

*Attorneys for Plaintiff*