IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Civil Action No. 7:21-cv-00061-M

| | | |
|---|---|---|
| TONYA BARBER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | DEFENDANT'S MEMORANDUM |
| | ) | OF LAW IN SUPPORT OF |
| COASTAL HORIZONS CENTER, INC., | ) | MOTION FOR PARTIAL |
| | ) | SUMMARY JUDGMENT |
| | ) | |
| Defendant. | ) | |
| | ) | |

NOW COMES Defendant Coastal Horizons Center, Inc. ("CHC") and submits this Memorandum in Support of its Motion for Partial Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking partial summary judgment on Plaintiff's claims as well as summary judgment as to CHC's entitlement to attorneys' fees on its counterclaims.

## STATEMENT OF THE CASE

Plaintiff Tonya Barber is a former employee of CHC. Plaintiff claims her termination from employment with CHC was retaliatory and violated the Federal False Claims Act, the NC False Claims Act, the FLSA, the NC Wage and Hour Act, the North Carolina Retaliatory Employment Discrimination Act, and North Carolina Public Policy. Plaintiff also claims CHC failed to pay her all wages due in violation of the FLSA and NC Wage and Hour Act.

CHC has asserted counterclaims against Plaintiff for embezzlement of CHC property. Such claims include causes of action for Conversion, N.C.G.S. § 538.2 and Punitive Damages. Plaintiff's Reply to CHC's counterclaims has been stricken due to Plaintiff's fabrication of evidence, and Plaintiff is thus in default regarding CHC's counterclaims.

Via this Motion, CHC seeks summary judgment in its favor regarding Plaintiff's retaliatory termination claims as well as a determination that CHC is entitled to its attorneys' fees incurred in prosecuting its counterclaims. CHC does not seek summary judgment regarding Plaintiff's claims for unpaid wages under the FLSA or NC Wage and Hour Act.

## UNDISPUTED MATERIAL FACTS

Coastal Horizons Center, Inc.

CHC is a non-profit corporation providing professional assistance to persons in need of services, including but not limited to mental health, substance use, crisis counseling and housing. CHC is a sizeable organization and employs more than 600 individuals in North Carolina. Margaret Weller-Stargell has served as President and CEO of CHC since 1995. As CEO, Weller-Stargell holds the exclusive authority to terminate CHC employees. (Weller-Stargell Decl. ¶ 3).

HHH Program.

CHC's HUD Horizons Housing Program ("HHH Program") is funded by the U.S. Department of Housing and Urban Development ("HUD"). HUD has funded the HHH Program for over 20 years and continues to do so. Through the HHH Program,

CHC assists in providing housing to individuals or families ("clients") struggling with chronic homelessness. (Weller-Stargell Decl. ¶ 4).

During the relevant time period, Plaintiff and Charlotte Rosenberg were part-time case managers providing customer-facing services for the HHH Program. Eline Ricci, Continuum of Care Coordinator, supervised the case managers and Kenny House, VP of Clinical Services, provided executive supervisory support. Bill Van Lew, CFO, and Jenifer Burns, Controller, provided financial and accounting support for the HHH Program. (Weller-Stargell Decl. ¶¶ 6, 7; House Decl. ¶ 3).

Plaintiff's Employment as a Case Manager.

On January 11, 2016, CHC hired Plaintiff to act as full-time case manager splitting time between two programs—the HHH Program and a state-funded Critical Time Intervention ("CTI") Program. (Weller-Stargell Decl. ¶ 5; Weller-Stargell Decl. Ex. A, Offer Letter; House Decl. ¶ 4). By the time of her Probation Status Review on July 8, 2016, Plaintiff had missed 29 full days of work, three half days, and had often arrived late. (Weller-Stargell Decl. Ex. B, Probation Status Review; House Decl. ¶ 4). In lieu of termination, VP House offered, and Plaintiff accepted, a part-time case manager position working solely with the HHH Program. Plaintiff remained employed in that capacity from that point until her termination on January 19, 2021. (House Decl. ¶ 4; Weller-Stargell Decl. ¶ 6; Plaintiff Depo. p. 111).

Plaintiff Raises Concerns About the HUD Program As Well As Her Pay.

Throughout her employment, starting years before her termination, Plaintiff expressed concerns and made complaints (both internally and externally) about the way CHC administered its HHH program, and particularly financial reporting

associated with the HHH program. Also, Plaintiff's hours and pay changed several times during her tenure of employment, and she expressed concerns that she was not being paid appropriately. CHC, and particularly House, looked into Plaintiff's complaints and determined CHC was managing its program, and Plaintiff, appropriately. (House Decl. ¶ 5; Weller-Stargell Depo. pp. 48-50).

Plaintiff Expresses Her Belief That CHC Committed Fraud on HUD.

On September 8, 2020, during a disciplinary meeting with supervisor Ricci and VP House, Plaintiff alleged, for the first time, that CHC committed fraud in its handling of HUD funds. (Am. Compl. DE 15, p. 11 ¶41 and ¶43; Ricci Depo. p. 128:6-16; House Decl. ¶ 6). At the mention of fraud, VP House stopped the meeting and immediately informed President/CEO Weller-Stargell. (House Decl. ¶ 6; Weller-Stargell Decl. ¶ 8). Weller-Stargell took this allegation very seriously and undertook action to investigate it, most notably hiring Christopher Haney, CPA, CFE, a former FBI forensic accountant, to conduct an independent audit of the HHH program finances. (Weller-Stargell Decl. ¶¶ 8-9; Weller-Stargell Decl. Ex. D, Forensus Report p. 1). That audit included meeting with Plaintiff and examining materials she provided. (*Id.*; Am. Compl. DE 15, pp. 12-13 ¶¶ 44-45).

On January 6, 2021, Haney issued a report of his findings. While he did identify areas in which CHC could improve, Haney found <u>no evidence</u> of fraud. His report reads, in relevant part:

> Approach and Analysis: "Our analysis involved evaluating Ms. Barber's concerns, including materials she submitted to CHC management and CHC's external auditors. Our work also included understanding, defining, and requesting additional investigative

documentation and financial information from CHC, its external auditors, and HUD's open-source libraries. We performed a variety of quantitative and qualitative test work when analyzing this data. We also conducted interviews of various CHC accounting and finance personnel and met with Ms. Barber on two separate occasions."

Summary of Findings, Allegations of Fraud: "[B]ased on the results of our examination, we have found no evidence to support Ms. Barber's allegations that fraud occurred (i.e., intentional misstatements or fabrication of financial transactions) with regard to CHC's HUD grant program."

(Weller-Stargell Decl. Ex. D, Forensus Report p. 2).

Plaintiff's January 13, 2021 Email and Subsequent Termination.

On January 13, 2021, Plaintiff sent an email which ultimately resulted in her termination. That email was sent to Controller Jenifer Burns as well as other individuals in CHC's upper management – Supervisor Ricci, President/CEO Weller-Stargell, CFO Van Lew, and VP House. The email disparages Burns and her alleged lack of communication regarding a time-sensitive client situation. The email reads as follows:

I am following up on an action that is needed urgently. I typically handle client related needs when it also requires a payment form from Coastal. In the past, as I had described to everyone, I would be the point person to get each step confirmed and then paid, receipt copies, and all documentation collected/shared to Eline or whomever is requesting it. In doing it this way I find that each task is done without delay or much difficulty, this is important especially when we are dealing with strict timelines.

Jenifer advised that the client would need to go into Martin Storage facility in person to fill out paperwork for the storage unit (needed for the schedules move out from Kent St dated for tomorrow) and that Jenifer had spoken to Martin Self Storage staff and arranged for them to contact her (Jenifer) when the payment was needed to complete the task of renting a unit for the family. That was last week. I immediately responded to Jenifer after quickly calling the client to confirm the steps to them, and I also called the storage facility to ensure we were all on

the same page. I was told that once the clients completed the paperwork Jenifer had directed the storage company to email her and notify her so then Jenifer could call them to provide payment over the phone by credit card. The clients went Monday afternoon and completed the task and the person on duty at the storage unit tried calling Jenifer directly to quickly process the payment so they could assign a storage unit number and walk the client to it so they were familiarized with it prior to the move, and felt that emailing and waiting for a call back from Jenifer seemed like excessive steps and delays. I also concur with that sentiment. Jenifer was not able to be reached. So the representative asked the clients to come back Tuesday afternoon and it could be tried again, and if in the mean time Jenifer returned the call they would process the payment and assign a unit and then have the clients come in to sign off anyway (so basically even though it is extra steps for the business and the client they were trying to handle it the best way possible). The client went back in yesterday afternoon and was hopeful to be at the step where all that was required was signing off, a walk through to the unit and placing their lock they had purchased on the unit so they could return to their task of packing the last remaining items and such. The business emailed Jenifer prior to the client coming in, and emailed and called directly again while the client was waiting in the office yesterday afternoon. Several attempts to reach Jenifer for payment were made... none were successful. The client left, again, with out an assigned storage unit and feeling more stress and panic. Today at 2pm the client reached out to me upset as the storage company had continued to reach out but still... on the third day of attempting... was not successful. The move is tomorrow, and all of their belongings are supposed to be moved to storage unit while I continue to try and locate a unit that will accept our funding stream for them to move to. I cannot begin to explain how stressed out, justifiably, that this family is in seeing that Coastal Horizons has not prioritized them and supported them during this difficult transition.

I want to say that this feels like an isolated incident of poor communication and failure of duties by Jenifer, but I cannot say that with any ounce of confidence. Instead of being able to handle this as smoothly as I could for this client it has been unnecessarily overcomplicated and pushed to rely on Jenifer doing her required part which is not going well. How can I assist this client today - only a few hours before the storage facility closes- so they feel supported and cared for and the unit is confirmed to me and them by Martin Storage as being paid and ready for their lock??

> I am also requesting that this incident be remembered and factored into all the relevant situations prior that involved Jenifer Burns to either complete a financial transaction timely or provide confirmation and reports of transactions that are approved by HUD as well. There is a very clear and consistent pattern of neglect of duty that happens when tasks reach Jenifer or she is put in charge of the project/task completion.

(Weller-Stargell Decl. ¶ 11; Weller-Stargell Decl. Ex. E, January 13, 2021 Email).

Unbeknownst to CHC, Plaintiff also surreptitiously sent a blind carbon-copy (Bcc) of the email to the HUD employee acting as CHC's HUD housing-program liaison, Diane Dillahunt. The next day, Dillahunt "Replied All" to inform the recipients that HUD was going to request on-site monitoring of CHC's HUD program and that the conduct alleged in Plaintiff's email was unacceptable and may cause CHC to lose funding. (Weller-Stargell Decl. ¶ 12; Weller-Stargell Decl. Ex. E, January 13, 2021 Email).

After receiving Plaintiff's January 13 email, President/CEO Weller-Stargell personally contacted the parties referenced in it and was advised there was no hold up on any payment, and the clients at issue were well-served and appreciative. (Weller-Stargell Decl. ¶ 13; Weller-Stargell Depo. pp. 151:18-152:24).

As noted above, President/CEO Weller-Stargell has the exclusive authority to terminate CHC employees. (Weller-Stargell Decl. ¶ 2; House Decl. ¶ 2; House Depo. pp. 13:4-13, 69:20-22). Weller-Stargell determined that Plaintiff's January 13, 2021, email was inappropriate, unprofessional and a terminable offense, and she made the decision to terminate Plaintiff's employment as a result. Plaintiff was terminated on January 19, 2021. She was given a termination letter, which reads as follows:

> On January 13, 2021, you sent an email to Kenny House, Jenifer Burns, Bill Van Lew, Eline Ricci and Margaret Weller-Stargell. In that email

you were very critical of Jenifer and accused her of neglect with respect to a particular client's situation as well as an overall pattern of neglect regarding her duties. It was inappropriate for you to broadcast your criticisms of Jenifer in the manner in which you did.

While this internal communication itself is cause for concern, it soon thereafter came to our attention that you also surreptitiously included HUD representative Diane Dillahunt on your email (apparently by bcc). Your email prompted Ms. Dillahunt to reply to everyone, stating in writing that Coastal Horizons may be subject to increased scrutiny and/or loss of funding.

Upon further investigation, we found that the clients referenced in your January 13th email were in fact well-served and very appreciative for the aide our agency rendered them. So, while your January 13th communication would have been improper and egregious even if true, it is even more so now that it has turned out to be largely unfounded.

Your actions have placed this Agency, and particularly the very program for which you work, in jeopardy, and your employment is being terminated as a result.

(Weller-Stargell Decl. ¶ 14; Weller-Stargell Decl. Ex. F, Termination Letter; Weller-Stargell Depo. pp. 150:7-153:22, 157:4-24).

President/CEO Weller Stargell testified that any CHC employee who sends an email like Plaintiff's January 13, 2021, email would be terminated. (Weller-Stargell Depo. pp. 153:17-22, 157:4-24).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden initially of coming forward and demonstrating

the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met its initial burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The non-moving party may not rely upon mere allegations or denials of allegations in her pleadings to defeat a motion for summary judgment, instead, she "must set forth specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 323. Speculation and conjecture does not suffice. *St. Clair v. Gen. Motors Corp.* 10 F.Supp.2d 523, 532 (M.D.N.C. 1998). Conclusory personal beliefs are likewise ineffective to create a genuine issue of material fact for trial. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002); *Mackey v. Shalda*, 360 F.3d 463, 469-70 (4th Cir. 2004) ("A plaintiff's self-serving opinions, absent anything more, are insufficient"). The non-moving party must present sufficient competent evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby* at 248; *see also Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

When making the summary judgment determination, the facts and all reasonable inferences therefrom must be viewed in the light most favorable to the

non-movant. *Liberty Lobby* at 255. However, "a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. Summary judgment is appropriate against a party who fails to make a showing sufficient to establish any one of the essential elements of the party's claim on which he will bear the burden of proof at trial. *See Celotex* at 322-23.

## ARGUMENT

As set forth below, Plaintiff's claims premised upon her allegedly retaliatory termination must fail because the undisputed materials facts show that Plaintiff was terminated solely as a result of her sending the January 13, 2021, email disparaging Controller Jenifer Burns.

With regard to CHC's counterclaims premised upon Plaintiff's embezzlement of CHC property, CHC has already prevailed on those claims as a result of this Court sanctioning Plaintiff and entering default against her. Defendant is entitled to Summary Judgment in its favor establishing its entitlement to attorneys' fees pursuant to N.C.G.S. § 1-538.2.

I.    CHC IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FALSE CLAIMS ACT ("FCA") RETALIATION CLAIM.

A.    FCA: Protected-Activity Standard.

The FCA protects the government against false claims that are presented to it in federal contracts. *United States ex. rel. Grant v. United Airlines*, 912 F.3d 190, 196 (4th Cir. 2018). Specifically, the FCA prohibits any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or

approval" and "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). At issue here is the FCA's provision that prohibits retaliation "because of lawful acts done ... in furtherance of an action" under, or otherwise "to stop 1 or more violations of," the FCA. 31 U.S.C. § 3730(h). The Fourth Circuit explained:

> an act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA. A belief is objectively reasonable when the plaintiff alleges facts sufficient to show that he believed his employer was violating the FCA, that this belief was reasonable, that he took action based on that belief, and that his actions were designed to stop one or more violations of the FCA. However, while the plaintiff's actions need not "lead to a viable FCA action" as required under the distinct possibility standard, they must still have a nexus to an FCA violation.

*United Airlines*, 912 F.3d at 201-02. Thus, complaints that "merely express concern about regulatory non-compliance," but do not allege "specific illegal, fraudulent conduct against the government" do not have a nexus to an FCA violation. *Id.* at 202.

B.    FCA: Proof-of-Retaliation Standard.

Retaliation claims can be proven by either direct evidence of retaliatory intent or by use of the *McDonnell Douglas* burden-shifting framework. *United States ex rel. Cody v. ManTech Int'l, Corp.*, 746 F. App'x 166, 176 (4th Cir. 2018) (citations included); *Harris v. Blue Ridge Health Servs., Inc.*, 388 F. Supp. 3d 633, 639 (M.D.N.C. 2019). Direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Bandy v. City of Salem, Virginia*, 59 F.4th 705, 711 (4th Cir. 2023) (citations omitted); *Terry v. Perdue*, No. 20-2016, 2021 WL 3418124, at *3 (4th Cir. Aug. 5, 2021) (citations omitted). Even a direct statement reflecting a

discriminatory attitude must have a nexus with the adverse employment action. *Stevenson v. Parker Offshore, LLC*, No. 4:21-CV-70-FL, 2023 WL 2904691, at *8 (E.D.N.C. Mar. 27, 2023). Here, there is no direct evidence of retaliatory intent with respect to Plaintiff's termination; thus, *McDonnell Douglas* applies.

Under the *McDonnell Douglas* framework, Plaintiff must first establish a *prima facie* case of retaliation by showing: (1) she engaged in protected activity; (2) CHC knew about the protected activity; and (3) CHC terminated her as a result. *United Airlines*, 912 F.3d at 200; *Harris*, 388 F.Supp. 3d at 639. If the employee establishes a *prima facie* case, the burden then shifts to the employer to state a legitimate, nonretaliatory reason for its decision." *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006). After the employer articulates a legitimate reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation by showing "both that the reason was false and that [retaliation] was the real reason for the challenged conduct." *Jiminez v. Mary Washington College*, 57 F.3d 369, 378 (4th Cir. 1995). The FCA requires a showing of "but-for" causation. In other words, Plaintiff must show retaliation was the real reason for her termination— "but for" CHC's retaliatory animus, the adverse employment action would not have occurred. *See United States ex rel. Cody v. ManTech Int'l, Corp.*, 746 F. App'x 166, 177-78 (4th Cir. 2018).

C. <u>Plaintiff was Terminated for Sending her January 13, 2021 Email, Which Was Not Protected Activity.</u>

For purposes of this Motion, CHC concedes that Plaintiff engaged in FCA-protected activity at various times during her employment. The undisputed facts

show, however, that Plaintiff was ultimately terminated solely for one transgression – her January 13, 2021 email – which *was not* protected activity.

Plaintiff's email reflects the grievances of a disgruntled employee frustrated with her perception of an untimely response by CHC's Controller.  It is not and does not even come close to being a complaint or concern that CHC is defrauding or deceiving the federal government sufficient to trigger the protections of the FCA. It was also not an "investigation" of compliance with HUD regulations (which by itself is not a protected activity). *Pitts v. Howard Univ.*, 111 F. Supp. 3d 9, 17 (D.D.C. 2015) (an investigation of nothing more than employer's non-compliance with regulations does not constitute protected activity).   At most, Plaintiff's email expresses her disagreement with CHC business practices she believed were "excessive steps and delays" she found "unnecessarily complicated" that were required before making payments to the third-party storage-facility vendor.

The January 13, 2021 email was unquestionably a legitimate, nonretaliatory reason to terminate Plaintiff.  The email very publicly accused Burns of not timely returning calls, emails, and a general "neglect of duty" to CHC high-level executives, including President/CEO Weller-Stargell, CFO Van Lew, and VP House:

> I want to say that this feels like an isolated incident of poor communication and failure of duties by Jenifer, but I cannot say that with any ounce of confidence. . . .
>
> I am also requesting that this incident be remembered and factored into all relevant situations prior that involved Jenifer Burns to either complete a financial transaction timely or provide confirmation and reports of transactions that are approved by HUD as well.  There is a very clear and consistent pattern of neglect of duty that happens when tasks reach Jenifer or she is put in charge of the project/task completion.

(Weller-Stargell Decl. Ex. E, January 13, 2021 Email). Upon receiving this email, President/CEO Weller-Stargell personally contacted the parties involved and was advised there was no undue delay, and payment was not expected until the following day. (Weller-Stargell Decl. ¶ 13; Weller-Stargell Depo. pp. 151:18-152:24). Thus, not only was Plaintiff's very public criticism of Burns inappropriate in its delivery, it was factually inaccurate.

The email undermining Burns' ability to do her job is highly unprofessional. By copying CHC's executive officers, her intent was obviously malicious, vindictive and meant to embarrass Burns. Worse yet, CHC soon discovered Plaintiff had castigated Burns (and CHC as her employer) publicly because Plaintiff surreptitiously blind carbon-copied her email outside of the company to the HUD-liaison Diane Dillahunt. Plaintiff's surreptitious blind-copy of the email to Dillahunt had no legitimate purpose other than to tarnish CHC's reputation and its relationship with HUD. Indeed, it apparently did just that, because HUD-liaison Dillahunt replied to all recipients of the email informing them that HUD was going to request on-site monitoring of CHC's HUD program and further stated that the conduct alleged in Plaintiff's email was unacceptable and may cause CHC to lose funding. President/CEO Weller-Stargell concluded Plaintiff's email was cause for termination and that she would likewise terminate any other employee complaining of a co-worker and copying a funding source. (Weller-Stargell Decl. ¶ 14; Weller-Stargell Depo. p. 153:17-22).

Plaintiff's January 13, 2021 email violates CHC's policy requiring staff to treat co-workers respectfully, act in a manner that reflects favorably on the organization, and speak in a manner that communicates professionalism, respect towards others, and sensitivity to the audience involved. (Weller-Stargell Decl. Ex. G, Personnel Policies p. 64). Such unprofessional behavior by one employee directed at another employee is a legitimate, non-discriminatory and non-retaliatory reason for an employment decision. *See Diventi v. Volvo Grp. N. Am., LLC*, No. 1:20-CV-26, 2021 WL 7160670, at *1 (M.D.N.C. Feb. 18, 2021) (unprofessional to other employees); *Veluzat v. Williamson Med. Ctr.*, 627 F. App'x 534, 541 (6th Cir. 2015) (unprofessional email to another employee); *Yu v. New York City Hous. Dev. Corp.*, 494 F. App'x 122, 126 (2d Cir. 2012) (speaking to coworkers and supervisor in an unprofessional manner); *Burris v. Brazell*, 351 F. App'x 961, 963 (5th Cir. 2009) (unprofessional to executive director). Plaintiff's additional underhanded attempt to undermine CHC's grant and relationship with HUD by blind-copying her vindictive email to Dillahunt is another valid and non-retaliatory reason for Plaintiff's termination. *Rayford v. Wexford Health Sources, Inc.*, 622 F. App'x 564, 566 (7th Cir. 2015) (plaintiff's conduct of disparaging his employer to the employer's own Vice President of Human Resources a nondiscriminatory, legitimate reason); *Wood v. Bailey-Harris Const. Co.*, No. 2:11-CV-136-WHA, 2012 WL 3069949, at *9 (M.D. Ala. July 27, 2012) (plaintiff's comments about his employer's poor quality of work made to a manager of the client for whom plaintiff's employer was working—and for whom plaintiff himself was working—was sufficient to serve as a legitimate, nondiscriminatory reason for

terminating plaintiff, especially as plaintiff's comments would have the effect of sabotaging his employer).

Finally, the facts establish that the January 13, 2021, email was the real reason for Plaintiff's termination and was not pretextual. Recall that Plaintiff had been complaining about the administration of the HUD program and the handling of its finances for *years.* As this Court is aware, temporal proximity between Plaintiff's protected activity and her termination matters a great deal. *Clark Cnty. Sch. Dist.*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be 'very close.'"); *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) (same). A three-to-four-month lapse between the employer's knowledge of protected activity and alleged retaliation is too long to establish causation by temporal proximity alone. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021) (citing *Pascual*, 193 F. App'x at 233). Plaintiff's assertion that retaliation caused her termination is merely her own subjective belief, which is insufficient to create a genuine issue of material fact for submission to the jury. *See Whitaker v. Nash-Rocky Mount Bd. of Educ.*, No. 5:12-CV-623-BO, 2013 WL 5592881, at *3 (E.D.N.C. Oct. 10, 2013), *aff'd,* 562 F. App'x 180 (4th Cir. 2014) (Plaintiff "proffered only his own conclusory statements and personal beliefs, which are an insufficient basis upon which to survive a summary judgment motion.").

Were CHC inclined to terminate Plaintiff in retaliation for complaining of mismanagement of HUD funds, it certainly had ample opportunities to do so long before January, 2021. Even after Plaintiff's allegation that CHC had committed *fraud,* an allegation which was ultimately unsubstantiated after an exhaustive and expensive audit by a former FBI agent, Defendant took no adverse action against Plaintiff. It was only when Plaintiff disparaged Burns both internally and externally via her January 13, 2021 email that CHC terminated her employment.

Finally, President/CEO Weller-Stargell is responsible for all terminations at CHC. She made the decision to terminate Plaintiff and testified that she would terminate any employee who complained about another employee and copied a funding source like Plaintiff did in her January 13, 2021 email. *See Smith v. Dep't of Lab.*, 674 F. App'x 309, 315-16 (4th Cir. 2017) (applying "same decision" defense—employer would have made same employment decision regardless of protected activity—in whistle blower cases). There is simply no basis to prescribe retaliatory intent to CHC and President/CEO Weller-Stargell under these circumstances.

Ultimately, this Court need only answer two questions when ruling on this Motion: (1) Was Plaintiff terminated for sending the January 13, 2021, email? (2) Was the January 13, 2021 email protected activity? The answer to the first is unquestionably *yes.* The answer to the second is unquestionably *no.* CHC is entitled to summary judgment in its favor on Plaintiff's FCA retaliation claim.

II.    CHC IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S NORTH CAROLINA FCA RETALIATION CLAIM.

When initially hired in January 2016, Plaintiff worked as a case manager for both the HHH program and North Carolina state-funded Critical Time Intervention (CTI) program. (Am. Compl. DE 15, p. 3 ¶ 11 and p. 22 ¶ 76).  Plaintiff generally alleges that in the first half of 2016 she questioned CHC's "compliance (or lack thereof) with government regulations with respect to the government-funded programs she worked in" presumably including CTI. (Am. Compl. DE 15, p. 3 ¶ 14). She also generally alleges that "[d]uring her employment, Ms. Barber voiced good-faith opposition and concerns about Defendant's compliance with regulations regarding funding and expenditures for at least one state-funded program," which again is presumably CTI. (Am. Compl. DE 15, p. 22 ¶ 77).

CHC denies that Plaintiff made any complaint about CTI or other state-funded program having a nexus to the NC FCA and, as discussed above, her general complaints about compliance do not constitute protected activity.  Furthermore, as explained above, Plaintiff was terminated for her unprofessional January 13, 2021 email secretly shared outside of CHC with a CHC <u>federal</u> funding source (HUD's liaison, not CTI).  Her termination was for a legitimate, nonretaliatory reason and had nothing to do with CTI or any of her complaints.

Moreover, like the FCA, the NC FCA has a three-year statute of limitations. N.C. Gen. Stat. § 1-613.  Plaintiff's involvement with CTI ended approximately July 11, 2016. (House Decl. ¶ 4; Weller-Stargell Decl. ¶¶ 5-6; Plaintiff Depo. p. 111). Accordingly, even if she had made a protected complaint and was subjected to

retaliation (which CHC vehemently denies), her claims are time-barred and should be summarily dismissed.

## III. CHC IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FLSA RETALIATION, REDA and WDPP CLAIMS.

Plaintiff alleges she was subject to retaliation and terminated by CHC for complaining of wage payment practices violating the FLSA and NC Wage and Hour Act. (Am. Compl. DE 15, pp. 25-27 ¶¶ 106, 108, 109, 115, 117). She brings these claims as causes of action pursuant to the FLSA, NC REDA, and North Carolina Public Policy. The elements of an FLSA retaliation claim are (1) plaintiff engaged in an activity protected by the FLSA; (2) plaintiff suffered an adverse action by the employer subsequent to or contemporaneous with such protected activity; and (3) a causal connection exists between the employee's activity and the employer's adverse action. *Walsh v. LaIaja, Inc.*, 565 F.Supp. 3d 766, 771 (E.D.N.C. 2021). The elements of a REDA claim are (1) plaintiff engaged in an activity protected by REDA; (2) plaintiff suffered an adverse employment action; and (3) a causal connection exists between the exercise of the protected activity and the alleged retaliatory action. *Smith v. Computer Task Grp., Inc.*, 568 F.Supp. 2d 603, 613 (M.D.N.C. 2008). Plaintiff's WDPP claim is dependent upon the viability of her REDA claim. *See Tuan H. Nguyen v. Austin Quality Foods, Inc.*, 974 F.Supp. 2d 879, 897 (E.D.N.C. 2013). Thus, the existence of a legitimate, non-discriminatory and non-retaliatory reason for termination defeats each of these claims.

As discussed previously, Plaintiff's termination is due solely to her January 13, 2021 email. Nothing in that email or her termination references wage practices or

wage complaints. Plaintiff's claims which are premised on her complaints about her wages are unsupported by any evidence and should be dismissed.

IV. CHC IS ENTITLED TO SUMMARY JUDGMENT ON ITS COUNTERCLAIM FOR ATTORNEY'S FEES PURSUANT TO N.C.G.S. § 1-538.2.

As part of this Court's March 1, 2023 Order, Plaintiff's Answer to CHC's Counterclaims was stricken, and the Clerk of the Court was ordered to enter a Default in Defendant's favor on its counterclaims against Plaintiff. (Order DE 73 p. 21) Default was entered against Plaintiff on CHC's Counterclaims the same day. (Entry of Default DE 74)

CHC's Counterclaim against Plaintiff includes a claim pursuant to N.C.G.S. § 1-538.2. Pursuant to N.C.G.S. § 1-538.2(a), attorney's fees are recoverable against Plaintiff. Accordingly, CHC requests summary judgment that it is entitled to its attorney's fees in bringing and prosecuting CHC's claims under N.C.G.S. § 1-538.2 against Plaintiff in an amount to be determined via a procedure ordered by the Court.

CONCLUSION

For the reasons and authorities as cited herein, Defendant CHC is entitled to summary judgment on each of Plaintiff's claims premised upon her termination. CHC is also entitled to summary judgment establishing its right to attorney's fees on its counterclaim under N.C.G.S. § 1-538.2.

Respectfully submitted, this, the 30th day of August, 2023.

CRANFILL SUMNER LLP

By: /s/ Benton L. Toups
BENTON L. TOUPS
N.C. State Bar No. 28910
PATRICK M. MINCEY
N.C. State Bar No. 38372
5535 Currituck Drive, Suite 210
Wilmington, NC 28403
Telephone: (910) 777-6000
Facsimile: (910) 777-6111
E-mail: btoups@cshlaw.com
pmincey@cshlaw.com
*Attorneys for Defendant*

## CERTIFICATE OF COMPLIANCE

I certify that this Memorandum of Law complies with the word count limit set forth in Local Rule 7.2(f). The number of words in this Memorandum of Law, exclusive of the caption, signature block, and certificate of service, does not exceed 8,400 words. According to the word count function of the word processing software used to prepare the Memorandum of Law, this Memorandum of Law contains 5,495 words.

CRANFILL SUMNER LLP

By:     /s/ Benton L. Toups
        BENTON L. TOUPS
        N.C. State Bar No. 28910

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system, which will send a copy to all counsel as follows:

L. Michelle Gessner
GessnerLaw, PLLC
1213 Culbreth Drive, Suite 426
Wilmington, NC 28405
michelle@mgessnerlaw.com
*Attorney for Plaintiff*

This the 30th day of August, 2023.

CRANFILL SUMNER LLP

By:  /s/ Benton L. Toups
BENTON L. TOUPS
N.C. State Bar No. 28910
PATRICK M. MINCEY
N.C. State Bar No. 38372
5535 Currituck Drive, Suite 210
Wilmington, NC  28403
Telephone: (910) 777-6000
Facsimile: (910) 777-6111
E-mail: btoups@cshlaw.com
         pmincey@cshlaw.com
*Attorneys for Defendant*