IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

Case No. 7:21-cv-00061-M

TONYA BARBER,

       Plaintiff,

v.                                                                                                  ORDER

COASTAL HORIZONS CENTER, INC.,

       Defendant.

These matters come before the court on the Defendant's Motion for Partial Summary Judgment [DE 83] and Plaintiff's Motion for Partial Summary Judgment [DE 87]. Defendant seeks summary judgment in its favor regarding Plaintiff's retaliatory termination claims under the federal False Claims Act ("FCA") and Fair Labor Standards Act ("FLSA"), and the North Carolina False Claims Act ("NCFCA"), Retaliatory Employment Discrimination Act ("NCREDA"), and the state's public policy. Defendant also seeks summary judgment "on its counterclaim for attorney's fees pursuant to N.C.G.S. § 1-538.2." DE 84 at 20. Plaintiff seeks summary judgment in her favor regarding her FCA claim. For the reasons that follow, Defendant's motion is granted in part, denied in part, and denied without prejudice in part, and Plaintiff's motion is denied.

I.  **Background**

    A.  Procedural History

Plaintiff initiated this action against Defendant on April 9, 2021, alleging violations of the FCA, the NCFCA, the FLSA, and the North Carolina Wage and Hour Act ("NCWHA"). DE 1.

On September 8, 2021, Plaintiff filed an Amended Complaint, adding claims under the NCREDA and for wrongful discharge in violation of public policy. DE 15. Plaintiff alleges generally that her employment was terminated in retaliation for complaints she made, which are protected by federal and state law, and that Defendant failed to pay her for all hours she worked during her employment. *See id.*

Defendant responded to the amended pleading on October 8, 2021, by filing an Answer and Counterclaim. DE 16. Defendant asserts state law claims against Plaintiff for conversion, statutory "theft," and punitive damages alleging that, during her employment, Plaintiff used Target gift cards, meant for HUD program clients, for her personal benefit. *See id.* Defendant also filed a report with the Wilmington Police Department, which has led to criminal charges purportedly pending against the Plaintiff.

Plaintiff filed an answer to the counterclaims, then filed a motion for leave to file a second amended complaint, seeking to add claims against Defendant for malicious prosecution, abuse of process, and intentional infliction of emotional distress based on its counterclaims. DE 19. Plaintiff's motion was referred to the Honorable Robert T. Numbers, II, Magistrate Judge, on February 2, 2022, and he denied the motion on July 1, 2022. DE 67. Plaintiff has neither objected to nor appealed Judge Numbers' ruling pursuant to 28 U.S.C. § 636(b)(1).

On December 29, 2021, Defendant filed a motion for sanctions, dismissal, and default judgment against the Plaintiff for her use of a "fake" email in this litigation. DE 23. Judge Numbers heard the motion and issued a recommendation that Defendant's motion be granted and Plaintiff's claims be dismissed. DE 68. Plaintiff objected to the entirety of Judge Numbers' recommendation and, on de novo review, this court accepted in part the recommendation and granted in part and denied in part the Defendant's motion. DE 73. Specifically, the court found

2

Plaintiff had engaged in sanctionable conduct; struck Plaintiff's answer to Defendant's counterclaims and entered default against her; dismissed Plaintiff's requests for "punitive," "liquidated," and "treble" damages; prohibited Plaintiff from using the fake email in this litigation; and awarded Defendant its reasonable attorney's fees expended in the adjudication of the motion for sanctions. *Id.*

During the pendency of the motion, all proceedings were stayed by an order issued by Judge Numbers. This court lifted the stay and the parties proceeded to complete discovery on Plaintiff's claims and Defendant's claimed damages. The present motions were filed by the deadline of August 31, 2023, briefed, and submitted to this court on October 10, 2023.

B. Findings of Fact

Unless they cite to the record, the following findings of relevant facts are undisputed for purposes of the present motion. The court will not consider proffered "facts" supported solely by the operative pleading in this case. *See Atkins v. Glaser T*, 823 F. App'x 218, 219 (4th Cir. 2020) ("... 'the nonmoving party [must] go beyond the pleadings' and rely on 'affidavits, ... depositions, answers to interrogatories, and admissions on file' to prove that a genuine issue of material fact exists.") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015) (citation and internal quotation marks omitted) ("To overcome a motion for summary judgment, however, the nonmoving party may not rely merely on allegations or denials in its own pleading but must set out specific facts showing a genuine issue for trial.").

1. Defendant Coastal Horizons Center ("Defendant") is a non-profit corporation providing professional assistance to persons in need of services, including but not limited to mental

health, substance use, crisis counseling, and housing. Defendant is a sizeable organization and employs more than 600 individuals in North Carolina.

2.      Margaret Weller-Stargell has served as Defendant's President and Chief Executive Officer since 1995 and has been employed there since 1985.

3.      One of the many programs Defendant provides is the HUD Horizons Housing Program ("HHH Program"). The HHH Program is funded by the U.S. Department of Housing and Urban Development ("HUD"). HUD has funded the HHH Program for over twenty years and continues to do so. Through the HHH Program, Defendant assists in providing housing to individuals or families ("clients") struggling with chronic homelessness.

4.      On January 11, 2016, Defendant hired Plaintiff Tonya Barber ("Plaintiff") to act as full-time case manager splitting time between two programs—the HHH Program and a North Carolina state-funded Critical Time Intervention Program ("CTI Program").

5.      In July 2016, Defendant offered, and Plaintiff accepted, a part-time case manager position working solely with the HHH Program. Plaintiff remained employed in that capacity from that point until her termination on January 19, 2021. Plaintiff no longer worked on the CTI Program.

6.      Throughout Plaintiff's employment, Defendant's Vice President of Clinical Services, Kenny House, provided executive supervisory support for the HHH Program. Defendant's Chief Financial Officer, Bill Van Lew, and Controller, Jenifer Burns, provided financial and accounting support for the HHH Program. During the relevant time period, Eline Ricci, Continuum of Care Coordinator, supervised Plaintiff and Charlotte Rosenberg, another part-time case manager.

4

7.    Throughout her employment, Plaintiff expressed concerns and made complaints about the way Defendant administered its HHH program and, particularly, financial reporting associated with the HHH program. Also, Plaintiff's hours and pay changed several times during her tenure of employment, and she expressed concerns that she was not being paid appropriately.

8.    In June 2020, Plaintiff emailed her supervisor, Ricci, about Plaintiff's concerns related to record-keeping, reporting, and spending of HUD funds by Burns, CHC's Controller. This email thread specifically addressed Burns' drawing down of $19,766.65 of HUD funds without proper documentation and recordkeeping. Ricci echoed and agreed with Barber's complaints about Burns, stating: "Truthfully I feel that last year we protected [Burns] during the audit." Ricci indicated that she would escalate the issue to her supervisor, Kenny House.

9.    On August 7, 2020, Plaintiff forwarded this email thread to the HUD employee acting as Defendant's HUD housing-program liaison, Diane Dillahunt.

10.   On August 21, 2020, Plaintiff again emailed Ricci and included a table listing her concerns regarding the handling of HUD funds, identifying the steps for resolution, and explaining why the steps were needed.

11.   After receiving the August 21 email, Ricci forwarded it to Charlotte Rosenburg, stating: "So I feel like Tonya is going behind everyone's backs and reporting to Diane [Dillahunt]. Is that what you feel/hear/see?" Rosenberg responded that she did not understand why Barber was not "sharing" her concerns with CHC. Later that evening, Rosenberg sent another response to Ricci stating, "I have no proof but that is my gut and it is feeling really sick right now."

5

12. Ricci also forwarded Plaintiff's August 21 email to VP House, explaining that Plaintiff had been in regular contact with Dillahunt about the issues identified in Plaintiff's email and that she told Plaintiff not to have financial conversations with Dillahunt and to refer Dillahunt to Ricci or Burns.

13. On August 24, 2020, Ricci forwarded Plaintiff's August 21 email to Clif Bridges, Continuum of Care Data Coordinator, stating, "I am so done with entire thing right now!" Bridges responded, "Fan-f-in-tastic!" Ricci responded, "I have no words at this point. I don't even know what to do, but I think Tonya may need to look for different employment . . . ."

14. On August 28, 2020, Ricci forwarded Plaintiff's August 21 email to Controller Jenifer Burns, the person about whom Plaintiff had complained.

15. On August 28, 2020, Burns forwarded Plaintiff's August 21 email to Robert Jalbert, Vice President of Human Resources, expressing anger about Plaintiff's complaints and asking whether she could "put a complaint in Barber's file."

16. Jalbert responded to Burns and copied House, stating that they would work together, along with Ricci, to "figure this out."

17. Burns also forwarded Plaintiff's August 21 email to Margaret Weller-Stargell, President and CEO, stating, "This is the email that Eline sent me that has Tonya's 'concerns.'"

18. On September 8, 2020, Ricci forwarded Plaintiff's August 21 email to Weller-Stargell, CFO Bill Van Lew, Jalbert, and House.

19. That same day, Plaintiff met with House and Ricci (Plaintiff's supervisor), and was presented with a written reprimand charging Plaintiff with improperly communicating with Diane Dillahunt at HUD and with making negative statements about Defendant to other

6

staff. During this meeting, Plaintiff expressed, for the first time, her belief that Defendant had committed fraud in its handling of HUD funds. At the mention of fraud, House stopped the meeting and immediately informed President/CEO Weller-Stargell. Plaintiff did not sign the written reprimand but took the document with her when she left the meeting.

20. Weller-Stargell immediately notified CHC's Board of Trustees and CHC's external auditor of Plaintiff's fraud allegation.

21. On September 14, 2020, Barber received a revised written reprimand from House, which copied Ricci, Weller-Stargell, and Jalbert. This revision notes, "please disregard all previous drafts." The revised write-up charged Plaintiff with communicating about program operations without following the proper chain of command, failing to accept direction from supervisors, and working additional hours without advance approval. The reprimand also directed that "[r]outine communications about program operations with HUD will be done through [Plaintiff's] immediate supervisor" and that Plaintiff must "ensure that [her] supervisor and/or the Finance Department are included in all communications."

22. That same day, CFO Van Lew emailed Don McNeill at Dixon Hughes Goodman, an accounting firm, to inform him that Plaintiff stated during a meeting to review a written reprimand that the "HUD Housing project [was] not being run properly by the Program Director and the Controller" and she "alleged fraud on our part in the financial reports being submitted to HUD." McNeill commenced an audit of the Defendant based on Plaintiff's fraud allegation.

23. On September 16, 2020, Plaintiff emailed her concerns to CHC's Board of Trustees Chair and Vice Chair, and to Weller-Stargell. The email recites Plaintiff's history of her

complaints to her supervisors and upper management regarding poor recordkeeping and mismanagement of HUD funds.

24. On September 17, 2020, Plaintiff's prepared a lengthy "Notice to Auditor" in which she spelled out her concerns of financial mismanagement, poor recordkeeping, and potential fraud. McNeill read Plaintiff's report on September 18, 2020.

25. On September 21, 2020, Plaintiff emailed House a written response to the September 14, 2020 revised written reprimand and copied Ricci, Jalbert, and Weller-Stargell. In her email, Plaintiff again mentioned her belief that the Controller, Jenifer Burns, was "misappropriating HUD government funds."

26. Weller-Stargell undertook action to investigate the fraud allegation, first by notifying Defendant's board of trustees and external auditor, then by hiring Christopher Haney, CPA, CFE, a former forensic accountant with the Federal Bureau of Investigation, to conduct an independent audit of the HHH program finances. Defendant provided Haney access to CHC's documentation and financial information, accounting and financial personnel, and external auditors, and he met with Plaintiff regarding her specific allegations.

27. On December 7, 2020, McNeill emailed Van Lew and Weller-Stargell to inform them he had spoken to "the attorney and the forensic audit person." When Van Lew asked McNeill for additional feedback, McNeill responded, "I am not sure the scope of their investigation. Maybe they are trying to discredit the employee as to her knowledge of the program, etc. I am not sure." McNeill states that he also told them what he did in his approach "as it related to the audit of the financial statements around the issue of fraud."

28. On December 17, 2020, Haney, the forensic auditor, emailed Plaintiff indicating he was hired by Defendant to independently evaluate Plaintiff's concerns regarding CHC's HUD

grants. Haney advised that he had already spoken with McNeill and received Plaintiff's materials from him.

29. Plaintiff alleges she participated in Haney's investigation as follows: "Ms. Barber spoke at length with Defendant's auditors" and "Ms. Barber worked at length with the outside investigator hired by Defendant to investigate the financial issues she had been raising" and she had "extensive conversations with financial experts" "in or about late December of 2020 through in or about January of 2021." Am. Compl. ¶¶ 44-45, DE 15.

30. On January 4, 2021, Plaintiff emailed House and copied Ricci, Burns, and Van Lew, regarding a family that was moving and would be in need of a storage unit. The email correspondence on the topic continued throughout the next day, January 5, 2021, among these individuals. During the exchanges, Plaintiff expressed her concerns regarding the recordkeeping and spending of HUD funds. Plaintiff eventually included Weller-Stargell in the email thread, summarizing the issues and referencing "the mismanagement going on at every level." Weller-Stargell responded asking for a meeting to address Plaintiff's concerns.

31. On January 6, 2021, Haney issued a report of his findings, summarized as follows:

> Allegations of Fraud: Due to the nature of fraud, no assurances can be given that fraud does not exist. However, based on the results of our examination, we have found no evidence to support Ms. Barber's allegations that fraud occurred (i.e., intentional misstatements or fabrication of financial transactions) with regard to CHC's HUD grant program.

> Allegations of Misuse and Improper Record-Keeping: Our examination did identify cases in which HUD grant funds were misapplied or reported incorrectly by CHC financial staff. Based on the results of our examination, we found no evidence to conclude these errors were intentional, but rather the consequence of inadequate training and/or insufficient financial controllership.

DE 86-1 at 17.

9

32. On January 11, 2021, Plaintiff exchanged emails with Dillahunt at HUD regarding Plaintiff's concerns about Defendant's management of HUD-funded cases. DE 90-32. Dillahunt advised Plaintiff that she would suspend any grant funds until she received additional information and that she had spoken with and advised Weller-Stargell that she was "requesting some technical assistance" for Defendant. *Id.* at 3. Dillahunt also specified that she did not "mention" the Plaintiff to Weller-Stargell "without [Plaintiff's] permission." *Id.*

33. On January 13, 2021, Plaintiff sent an email addressed to Weller-Stargell, House, Burns, Van Lew, and Ricci accusing Burns of not timely returning calls and emails from a third-party storage company, which Plaintiff believed put CHC's clients at risk and caused them stress. The email reads:

> I am following up on an action that is needed urgently. I typically handle client related needs when it also requires a payment form from Coastal. In the past, as I had described to everyone, I would be the point person to get each step confirmed and then paid, receipt copies, and all documentation collected/shared to Eline or whomever is requesting it. In doing it this way I find that each task is done without delay or much difficulty, this is important especially when we are dealing with strict timelines.

> Jenifer advised that the client would need to go into Martin Storage facility in person to fill out paperwork for the storage unit (needed for the schedules move out from Kent St dated for tomorrow) and that Jenifer had spoken to Martin Self Storage staff and arranged for them to contact her (Jenifer) when the payment was needed to complete the task of renting a unit for the family. That was last week. I immediately responded to Jenifer after quickly calling the client to confirm the steps to them, and I also called the storage facility to ensure we were all on the same page. I was told that once the clients completed the paperwork Jenifer had directed the storage company to email her and notify her so then Jenifer could call them to provide payment over the phone by credit card. The clients went Monday afternoon and completed the task and the person on duty at the storage unit tried calling Jenifer directly to quickly process the payment so they could assign a storage unit number and walk the client to it so they were familiarized with it prior to the move, and felt that emailing and waiting for a call back from Jenifer seemed like excessive steps and delays. I also concur with that sentiment. Jenifer was not able to be reached. So the representative asked the clients to come back Tuesday afternoon

and it could be tried again, and if in the meantime Jenifer returned the call they would process the payment and assign a unit and then have the clients come in to sign off anyway (so basically even though it is extra steps for the business and the client they were trying to handle it the best way possible). The client went back in yesterday afternoon and was hopeful to be at the step where all that was required was signing off, a walk through to the unit and placing their lock they had purchased on the unit so they could return to their task of packing the last remaining items and such. The business emailed Jenifer prior to the client coming in, and emailed and called directly again while the client was waiting in the office yesterday afternoon. Several attempts to reach Jenifer for payment were made... none were successful. The client left, again, without an assigned storage unit and feeling more stress and panic. Today at 2pm the client reached out to me upset as the storage company had continued to reach out but still... on the third day of attempting... was not successful. The move is tomorrow, and all of their belongings are supposed to be moved to storage unit while I continue to try and locate a unit that will accept our funding stream for them to move to. I cannot begin to explain how stressed out, justifiably, that this family is in seeing that Coastal Horizons has not prioritized them and supported them during this difficult transition.

I want to say that this feels like an isolated incident of poor communication and failure of duties by Jenifer, but I cannot say that with any ounce of confidence. Instead of being able to handle this as smoothly as I could for this client it has been unnecessarily overcomplicated and pushed to rely on Jenifer doing her required part which is not going well. How can I assist this client today - only a few hours before the storage facility closes- so they feel supported and cared for and the unit is confirmed to me and them by Martin Storage as being paid and ready for their lock??

I am also requesting that this incident be remembered and factored into all the relevant situations prior that involved Jenifer Burns to either complete a financial transaction timely or provide confirmation and reports of transactions that are approved by HUD as well. There is a very clear and consistent pattern of neglect of duty that happens when tasks reach Jenifer or she is put in charge of the project/task completion.

 Jenifer Burns
Wed 1/6/2021 11:34 AM
To: Tonya Barber; MSS 17 <mss17@martinselfstorage.com>
Cc: Kenny House; Eline Ricci; Bill Van Lew

I have spoken with Martin Self Storage. The client will need to go into the office or call the office on Monday or Tuesda

11

Tonya Barber
Wed 1/6/2021 1:12 PM
To: Jenifer Burns; MSS 17 <mss17@martinselfstorage.com>
Cc: Kenny House; Eline Ricci; Bill Van Lew

Thank you, I've let the client know this information.

Best,

Tonya Barber, MFT
HUD & Affordable Housing Specialist
HHH Case Manager

Coastal Horizons Center, Inc
Cell: 910.524.5498
Phone: 910.343.0145
Fax: 910.341.5779

DE 86-1 at 21-23.

34.    Plaintiff sent a blind carbon copy (bcc) of the January 13, 2021 email to Dillahunt at HUD.
The next day, Dillahunt responded by selecting "reply all" to inform the email recipients
that HUD intended to request onsite monitoring of Defendant's HUD program and that the
conduct alleged in Plaintiff's email was unacceptable and might cause Defendant to lose
funding. DE 90-34.

35.    After receiving the January 13, 2021 email, Weller-Stargell "personally contacted the third-
party storage company" referenced in the email, and was advised that "there was no hold
up" of services to the client and that "payment was not expected until the next day." Decl.
¶ 13, DE 86-1 at 5.

36.    Weller-Stargell attests that she determined the Plaintiff's January 13, 2021 email
complaining of a co-worker and copying a CHC funding source was inappropriate and
unprofessional, and constituted a terminable offense. *Id.* at ¶ 14. Plaintiff was notified of
her termination by the following January 19, 2021 letter:

> On January 13, 2021, you sent an email to Kenny House, Jenifer Burns, Bill
> Van Lew, Eline Ricci and Margaret Weller-Stargell. In that email, you were
> very critical of Jenifer and accused her of neglect with respect to a particular
> client's situation as well as an overall pattern of neglect regarding her duties.

12

It was inappropriate for you to broadcast your criticisms of Jenifer in the manner in which you did.

While this internal communication itself is cause for concern, it soon thereafter came to our attention that you also surreptitiously included HUD representative Diane Dillahunt on your email (apparently by bcc). Your email prompted Ms. Dillahunt to reply to everyone, stating in writing that Coastal Horizons may be subject to increased scrutiny and/or loss of funding.

Upon further investigation, we found that the clients referenced in your January 13th email were in fact well-served and very appreciative for the aide our agency rendered them. So, while your January 13th communication would have been improper and egregious even if true, it is even more so now that it has turned out to be largely unfounded.

Your actions have placed this Agency, and particularly the very program for which you work, in jeopardy, and your employment is being terminated as a result.

DE 86-1 at 25. The letter was signed by Jalbert, Defendant's Vice President of Human Resources.

*Id.*

## II.   Legal Standards

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. If "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" the court shall grant summary judgment. Fed. R. Civ. P. 56(a).  A dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party, and "[a] fact is material if it might affect the outcome" of the litigation.  *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (internal quotations and citations omitted).  The court's role at the summary-judgment stage is not "to weigh the evidence and determine the truth of the matter" but, rather, "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Accordingly, the court must "resolve all factual disputes and any competing, rational inferences in the light most favorable" to

the nonmoving party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

When the nonmovant bears the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this initial burden, the burden then shifts to the nonmoving party to point out "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see Celotex*, 477 U.S. at 324. "Significantly, a party must be able to present the materials it cites in 'a form that would be admissible in evidence,' and supporting affidavits and declarations 'must be made on personal knowledge' and 'set out facts that would be admissible in evidence.'" *Doe v. Morgan State Univ.*, 544 F. Supp. 3d 563, 573 (D. Md. 2021) (quoting Fed. R. Civ. P. 56(c)(2) & (c)(4)).

While "it is the province of the jury to resolve conflicting inferences from circumstantial evidence[,] [p]ermissible inferences must still be within the range of reasonable probability." *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir.), *cert. denied*, 358 U.S. 908 (1958). It is "the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Id.* Accordingly, when the evidence, taken

14

in the light most favorable to the nonmovant, reveals two equally plausible alternatives, a choice of one over the other would require a reasonable jury to speculate; in such instance, summary judgment is proper.

## III.  Discussion

Defendant seeks summary judgment in its favor on all claims except the "claims for unpaid wages under the FLSA and NC Wage and Hour Act" (*see* DE 84 at 2); in other words, Defendant argues that no genuine issues of material fact exist regarding Plaintiff's first, second, third (partial), fifth, and sixth claims for relief.  Plaintiff seeks summary judgment in her favor on her first claim for relief.  "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011).  On cross motions, the court must view the facts in the light most favorable to the opposing party. *Walker v. Donahoe*, 3 F.4th 676, 682 (4th Cir. 2021); *Aleman v. City of Charlotte*, 80 F.4th 264, 270 n.1 (4th Cir. 2023).

### A.  FCA Retaliation Claim (Cross Motions)

The Fourth Circuit instructs that the general purpose of the False Claims Act ("FCA") is to combat fraud against the federal government. *United States ex rel. Cody v. ManTech Int'l, Corp.*, 746 F. App'x 166, 175 (4th Cir. 2018).  Employees who take action to uncover fraud against the United States are protected by the FCA anti-retaliation provision, which "affords a cause of action to '[a]ny employee . . . discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section.'" *Id.* at 176 (quoting 31 U.S.C. § 3730(h)(1)).

"Retaliation claims can be proven by either the submission of direct evidence of retaliatory animus or by use of the *McDonnell Douglas* burden-shifting framework." *Id.* (noting that the Fourth Circuit had not "explicitly held that the *McDonnell Douglas* burden-shifting framework applies to retaliation cases under the FCA" but the framework had been applied to claims under similar statutes and "we see no reason that this framework would not apply in this context as well"). In other words, a plaintiff may establish a retaliation claim by (1) presenting sufficient evidence, direct or circumstantial, "for a reasonable jury to conclude, by a preponderance of the evidence, that [her protected activity] was a motivating factor for any employment practice" (*Desert Palace Inc. v. Costa*, 539 U.S. 90, 98-99 (2003)); or (2) establishing that the reason given for the adverse action is a pretext for unlawful retaliation through the *McDonnell Douglas* burden-shifting framework. *See Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005).

In the present case, the Plaintiff argues that "causation can be shown" by both direct and indirect (or, "circumstantial") evidence (DE 88 at 2). Defendant counters that Plaintiff's purported direct evidence—the January 19, 2021 termination letter—does not constitute "direct evidence," as it is defined by the Fourth Circuit. The court agrees with Defendant. Direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Bandy v. City of Salem, Virginia*, 59 F.4th 705, 711 (4th Cir. 2023) (quoting *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc), *abrogated on other grounds by Desert Palace*, 539 U.S. at 98). While the January 19, 2021 letter bears directly on Plaintiff's termination, it does not reflect directly any motivation to terminate Plaintiff because she engaged in activity protected by the FCA. Rather, Defendant specifically states in the January 19, 2021 letter that it terminated Plaintiff because "[i]t was

16

inappropriate for [her] to broadcast [her] criticisms of Jenifer in the manner in which [she] did"; "[she] also surreptitiously included HUD representative Diane Dillahunt on [her] email (apparently by bcc)"; and her criticisms of Jenifer "turned out to be largely unfounded." DE 86-1 at 25. In other words, the letter provides that Plaintiff was terminated for unnecessarily placing a HUD-funded program in jeopardy by broadcasting her unfounded criticisms of a fellow employee not only to company management but also to a HUD representative. *See id.* A factfinder would need to consider other and/or additional evidence to conclude that Defendant terminated Plaintiff based on her protected activity. Thus, the court will proceed to evaluate this claim pursuant to the *McDonnell Douglas* burden-shifting framework. *See* Pl.'s Memo, DE 88 at 24-29.

A plaintiff must prove the following to establish a prima facie case of retaliation under § 3730(h): (1) "[s]he engaged in 'protected activity' by acting in furtherance of a qui tam suit;" (2) "[her] employer knew of these acts;" and (3) a causal link exists—that is, "[her] employer took adverse action against [her] *as a result* of these acts." *Cody*, 746 F. App'x at 176 (quoting *Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir. 2013)) (emphasis in original). With respect to the third prong, "a retaliation claim under the FCA requires proof of 'but for' causation." *Id.* at 177.

If the plaintiff establishes this prima facie case, a presumption of retaliation arises, and the burden shifts to the employer to show that it had a legitimate non-retaliatory basis for its actions. *Id.* (citing *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015)). If the employer makes this showing, the presumption vanishes and the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons "were not its true reasons, but were a pretext for discrimination." *Id.* at 177-78. "At bottom, a plaintiff's ultimate burden as to causation is the same under either means of proof: she must show that the 'unlawful retaliation would not have occurred in the absence of the alleged wrongful action

17

or actions of the employer.'" *Id.* at 178 (quoting *Foster*, 787 F.3d at 249). Stated differently, "[a] plaintiff who can show that retaliation was the real reason for the adverse employment action will necessarily be able to show that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Id.* (quoting *Foster*, 787 F.3d at 252).

Based on the arguments and evidence presented, the court finds that it must determine whether genuine issues of material fact exist regarding (1) whether Barber engaged in protected activity when she sent the January 13, 2021 email to management, including a blind copy to a HUD representative; and (2) whether Barber's termination of employment on January 19, 2021 was the result of any conduct protected by the FCA.

### 1. *Does the January 13 email constitute protected activity?*

The court finds that material factual issues do not exist as to whether Plaintiff's January 13, 2021 email constitutes protected activity. "Simply reporting [an employee's] concern of a mischarging to the government to his supervisor does not suffice to establish that [the employee] was acting 'in furtherance of' a qui tam action." *U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 735 (4th Cir. 2010) (quoting *Zahodnick v. IBM Corp.*, 135 F.3d 911, 914 (4th Cir. 1997)). "A protected activity need not indicate that an actual FCA suit was being contemplated, ***but it must evince some attempt to expose possible fraud***." *Id.* (citing *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 733 (7th Cir. 1999) ("An employer is entitled to treat a suggestion for improvement as what it purports to be rather than as a precursor to litigation.")) (emphasis added). "For activity to rise above the level of ordinary critique and constitute a step in preparation for an FCA claim, there must be some suggestion of impropriety or illegality by the employer that the employee is attempting to uncover." *Id.*; *see also Glynn*, 710 F.3d at 214 ("The employee's investigation must concern 'false or fraudulent claims' or it is not protected activity

18

under the FCA."). That is, an employee's activity must "raise a distinct possibility of a viable FCA action." *Glynn*, 710 F.3d at 214-15.

The content of the January 13 message demonstrates that Plaintiff did not send the email to Defendant's management and Dillahunt in an effort to report, complain about, or otherwise challenge perceived ***fraudulent*** activity by the Defendant. Rather, Plaintiff reported what she perceived to be negligence on the part of Defendant's controller, Jenifer Burns. *See* DE 90-33. Plaintiff recounts a transaction involving one of her clients and a storage company, which was prepared to rent a storage space to the client once payment was made. Plaintiff reports that the storage company had been unable to contact Burns for payment, as Burns instructed it to do, and that the client felt unsupported and "justifiably stressed out" given a fast-approaching move date. Plaintiff complains that "[i]nstead of being able to handle this as smoothly as I could for this client[,] it has been unnecessarily overcomplicated and [we're] pushed to rely on Jenifer doing her required part which is not going well." *Id.* Plaintiff closes the email, "I am also requesting that this incident be remembered and factored into all the relevant situations prior that involved Jenifer Burns to either complete a financial transaction timely or provide confirmation and reports of transactions that are approved by HUD as well. There is a very clear and consistent pattern of *neglect of duty* that happens when tasks reach Jenifer or she is put in charge of the project/task completion." *Id.* (emphasis added).

Nothing in the January 13 email, which reports a perceived failure during a single transaction, suggests that Plaintiff believed Burns was committing fraud against the United States. *See Glynn*, 710 F.3d at 215 (the employee must be reporting an act that reasonably could lead to a viable FCA lawsuit). For example, Plaintiff did not assert that Burns may have redirected to herself or to others certain grant funds meant to pay for the client's storage, or that Burns intentionally

ignored or refused to communicate with the storage company in an attempt to avoid disbursing the allocated funds. Plaintiff's statement at the conclusion of the message "incorporating" all of her previous complaints about Burns does not, itself, convert the email to a complaint about fraud. Notably, Plaintiff does not dispute that the issue raised in the January 13 email was resolved the following morning after all parties completed all necessary tasks, including the completion of certain paperwork by the client and Burns' communication with the storage company regarding payment. *See* DE 93-11 at 14-15. Plaintiff's motion is denied in this respect.

> 2. *Do material factual issues exist regarding whether Plaintiff was terminated because she engaged in activity protected by the FCA?*

While the January 13, 2021 email does not itself constitute activity protected by the FCA, no party disputes that Plaintiff engaged in protected activity when she expressed her beliefs during the September 8, 2020 disciplinary meeting with House and Ricci that Defendant, including Burns, had engaged in fraudulent conduct by mismanaging HUD funds. Plaintiff also expressed her beliefs in a September 17, 2020 email to the company's auditor, McNeill, and in person during a December 2020 meeting with the company's forensic auditor, Haney. There is no dispute that Defendant knew of these protected communications. Accordingly, the court must determine whether genuine issues of material fact exist regarding whether Defendant terminated Plaintiff's employment[1] because of these communications.

---

[1] The court agrees with Defendant that, except for the September 2020 written reprimand, any other purported adverse employment actions listed by Plaintiff in her briefs (and on which she may rely for her FCA retaliation claim) are either time-barred or unsupported by the evidence presented. *See* 15 U.S.C. § 3630(h)(3). With respect to the September 2020 reprimand (*see* DE 90-17), an "employer's retaliatory actions must be sufficiently adverse to dissuade a reasonable employee from engaging in protected conduct." *United States ex rel. Potter v. CASA de Maryland*, No. CV PX-16-0475, 2018 WL 1183659, at \*7 (D. Md. Mar. 6, 2018) (citing *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) and *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 434 (4th Cir. 2015)). Courts in this district and in the Fourth Circuit have found that oral and/or written reprimands implementing no discipline are not materially adverse. *See Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 429 (4th Cir. 2015) (oral and written reprimands insufficient to

"The discharge of an employee soon after she engages in a protected activity is strongly suggestive of retaliatory motive, and gives rise to a sufficient inference of causation to satisfy the prima facie requirement." *Chapins v. Nw. Cmty. Servs. Bd.*, 243 F. Supp. 3d 739, 749 (W.D. Va. 2017) (quoting *Coursey v. Univ. of Md. E. Shore*, 577 F. App'x 167, 175 (4th Cir. 2014)) (internal brackets and quotation marks omitted). Conversely, "temporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation, and the causal connection may be severed by the passage of a significant amount of time, or by some legitimate intervening event." *Id.* at 749-50 (quoting *Feldman v. Law Enforcement Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014)) (internal brackets and quotation marks omitted). Here, the longest period between Plaintiff's protected activity and her termination is four months; the court finds this period, considered with the following additional evidence, supports an inference of retaliatory motive. *See Coursey*, 677 F. App'x at 175 (seven-month period supports the third prong). That is, Defendant's initial attempt to reprimand Defendant for reporting concerns to HUD regarding the management of grant funds (*see* DE 90-14) and Defendant's later discovery that Plaintiff had continued to communicate with Dillahunt at HUD regarding the

---

constitute adverse actions for retaliation claims); *see also id.* at 431 ("reprimands and poor performance evaluations occur with some frequency in the workplace" and "are much less likely to involve adverse employment actions than the transfers, discharges, or failures to promote whose impact on the terms and conditions of employment is immediate and apparent"); *Tang v. E. Virginia Med. Sch.*, No. 2:20CV575 (RCY), 2022 WL 981942, at *9 (E.D. Va. Mar. 30, 2022), *reconsideration denied*, No. 2:20CV575 (RCY), 2022 WL 16922820 (E.D. Va. Nov. 14, 2022) ("Plaintiff's negative performance evaluation does not constitute a materially adverse employment action. The same is true regarding the written reprimands."); *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 603 (D. Md. 2011) ("letter of counseling" that offered constructive criticism and cautioned that discipline could follow, but did not implement any discipline, was not materially adverse action). Here, the written reprimand identified perceived performance issues and directed Plaintiff to comply with company policies and practices; Defendant imposed no discipline through the September 14, 2020 written reprimand (*see* DE 90-17). *See White*, 548 U.S. at 67 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").

Defendant's internal operations—without Defendant's knowledge—may be suggestive of a causal link. Plaintiff has met her burden to demonstrate a prima facie case of retaliation under the FCA.

The burden shifts to Defendant to show a non-retaliatory reason for Plaintiff's termination. As noted above, Defendant has made such showing by asserting its belief, set forth in the January 19, 2021 letter, that Plaintiff was terminated for unnecessarily placing a HUD-funded program in jeopardy by broadcasting unfounded criticisms of a fellow employee not only to company management but also to a HUD representative. The burden shifts back to the Plaintiff to demonstrate genuine issues of material fact as to whether Defendant's reason is a pretext for unlawful retaliation.

Viewing the facts in the light most favorable to the Plaintiff as it must (*Walker*, 3 F.4th at 682), the court finds Plaintiff has narrowly met her burden. Robert Jalbert, Defendant's Vice President of Human Resources, testified during his deposition that the termination decision was made by Weller-Stargell and was "based on the commentary that [Plaintiff] shared about her thoughts on the performance of Jenifer Burns. … [W]e knew, obviously, that [Plaintiff] had whistleblower protection, but the language in the disclosure that was in that email about Jenifer and the accusations made about her were what we determined to be too egregious." Deposition of Robert Jalbert, July 12, 2023, DE 112-3 ("Jalbert dep."), 79: 5-16; 104: 10-15; *see also id.* 199: 25 – 200: 1-9 (Weller-Stargell was "ang[ry] or disappoint[ed] that Tonya sent an email defaming Jenifer to an outside source"). Weller-Stargell herself attested that "[i]f any employee were to complain about another employee and copy a funding source, they would be terminated." Deposition of Margaret Weller-Stargell, July 7, 2023 ("Weller-Stargell dep."), 153: 17-22, DE 112-1; *see also id.* 168: 3-11 (stating that Plaintiff was terminated after "she put [Defendant] at risk by sharing information about a personnel matter and sharing it with a funding source and that

funding source not having any details about the particular matter, which was not about mismanagement of funds.").

However, Jalbert, who signed but did not draft Plaintiff's termination letter (Jalbert dep. 69: 16-22), agreed with defense counsel that the letter may be construed as stating that Plaintiff "was terminated because she surreptitiously copied the federal government [on the January 13, 2021 email] and allegedly put increased scrutiny and potential loss of funding [on] Coastal." *Id.* 105: 8-24; *see also* 201: 5-15 (agreeing that the termination letter may be interpreted as stating that Plaintiff was terminated "because she had complained to the United States government about Coastal Horizons" and "it had nothing to do with Jenifer Burns."). He further agreed that such interpretation, i.e., "firing [Plaintiff] for complaining to Ms. Dillahunt," would constitute "retaliation." *Id.* at 107: 5-17.

Notably, Jalbert testified not only that he did not draft the termination letter but also that he did not check or "research" the accuracy of statements made in the letter, he made no changes to the letter, and he could not recall who asked him to sign the letter. *Id.* 72: 3-8; 73: 5-6; 74: 1-6. He also testified that during the entire time of his employment with Defendant, Weller-Stargell, who Defendant claims to have made the decision to terminate Plaintiff, is "the only person [who] has the authority to terminate an employee from Coastal Horizons." *Id.* 65: 5-6, 19-25; 66: 1-2; *see also* Deposition of Kenny House, July 14, 2023, DE 112-2 ("House dep."), 13: 7-8 ("all terminations are … approved by the president and CEO. . . . [A]s a director I don't have the authority to terminate on my own."); Deposition of Eline Ricci, July 13, 2023, DE 112-4 ("Ricci dep."), 41: 10-18 (attesting that she, as a supervisor at Coastal, did not have the authority to terminate any employee's employment). Jalbert did not testify that he had personal knowledge of any of the admissions he made regarding interpretation of the termination letter. Therefore,

Jalbert's suppositions about how the termination letter may be construed constitute mere speculation regarding Defendant's true reason for terminating Plaintiff and are inadmissible for the purpose of challenging Defendant's stated reason.

Nevertheless, viewing the facts in the light most favorable to Plaintiff, the court finds that other evidence in the record raises a slight, but reasonable, inference that Plaintiff's termination may have been in retaliation for her protected activity in violation of the FCA. For example, Jalbert testified that Weller-Stargell's "voice was a little angry" after Plaintiff reported Defendant to HUD, Weller-Stargell made the decision to file a counterclaim alleging conversion against Plaintiff, and a reasonable person might think" Defendant's filing of criminal charges against Plaintiff "was in retaliation for the HUD complaint." Jalbert dep. 187: 22 - 189: 24. He also testified that during a meeting in 2018 or 2019, House, Defendant's Vice President of Clinical Services, directed Plaintiff to "stay in her lane" after she complained about "the HUD funding and how it was being spent" by Defendant. *Id.* 117: 18 – 118: 19. Jalbert agreed that House's statement meant Plaintiff should "not challenge or question the HUD funding anymore" and that, while *he* did not see the statement as "any type of retaliation or threat," such statement "could be perceived as a threat" by an hourly employee such as Plaintiff. *Id.* 121: 15-22; 124: 11 – 125: 3; 128: 4-11.

Furthermore, on September 8, 2020, House and Ricci presented Plaintiff with a "Written Reprimand" at a meeting characterized as "disciplinary." *See* DE 90-14. The reprimand informs Plaintiff of an "issue" regarding her "recent communications with HUD and Diane Dillahunt," and states essentially that Plaintiff, who "did not have all of the necessary information" to discuss "financials" with Dillahunt, provided "partial information [that] cause[d] confusion and unnecessary drama." *Id.* Plaintiff was directed that "[c]onversations regarding [her] personal

24

beliefs or opinion of how [Defendant] is managing the HUD funds and program are not to be communicated with any outside agencies or representatives." *Id.* The reprimand concluded, "Failure to follow these guidelines provided in this Written Reprimand will result in further disciplinary action, up to and including, termination from employment." *Id.* Plaintiff did not sign this document and the meeting was summarily concluded when Plaintiff expressed her concern that Defendant had engaged in "fraud" with respect to its HUD program. The following week, on September 14, 2020, House presented Plaintiff with a revised Written Reprimand, which directed her to "please disregard all previous drafts" and explained that she was "not being reprimanded for expressing [her] belief" that someone at Coastal had committed fraud in handling HUD funds. DE 90-17. The reprimand directed that Plaintiff ensure her "supervisor and/or the Finance department are included in all communications" with HUD about Coastal's program operations and concluded with the same warning as the previous reprimand. *Id.* Given that Plaintiff's complaints to HUD were directed at Burns, Defendant's Controller in the Finance Department, a reasonable juror could conclude that Defendant may have been motivated to discipline Plaintiff because of such complaints.

The court concludes that the record before it presents genuine issues of material fact as to whether Plaintiff would not have been terminated but for her complaint(s) to HUD regarding what she perceived to be Defendant's mismanagement of HUD funds. A reasonable jury could find that Defendant was motivated to terminate Plaintiff's employment and was provided sufficient pretext to do so after the January 13, 2021 email exchange. Plaintiff's and Defendant's motions seeking summary judgment on the FCA retaliation claim are DENIED, and this claim will proceed to trial before a jury.

B.      Remaining Retaliation Claims

Plaintiff brings additional claims for retaliation in violation of the FLSA, NCFCA, NCREDA, and North Carolina's common law proscribing wrongful discharge in violation of public policy (WDPP). She has conceded that the NCFCA claim – her second claim for relief – should be dismissed as untimely. DE 94 at 20-21 ("Plaintiff is willing to dismiss her North Carolina FCA retaliation claim since her complaints about misuse of state funds in the CTI program . . . occurred in 2016."). Defendant argues that the remaining retaliation claims under the FLSA, REDA, and WDPP (i.e., third [partial], fifth, and sixth claims for relief) should be dismissed because no evidence supports them, and Plaintiff was terminated based solely on her January 13, 2021 email. Plaintiff counters only that "[Defendant] has not shown, by undisputed evidence, that Plaintiff was terminated solely based on the January 13, 2021 email." DE 94 at 20.

Plaintiff appears to misunderstand the summary judgment standard. When, as here, a nonmovant bears the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. Defendant has met its initial burden here by asserting that no evidence exists in support of Plaintiff's FLSA, REDA, and WDPP claims *and* by presenting evidence that the January 13 email serves as the sole basis for Plaintiff's termination.

If the moving party carries this initial burden, the burden then shifts to the nonmoving party to point out "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec.*, 475 U.S. at 587 (emphasis in original). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash*, 731 F.3d at 311. Instead, the nonmoving party must

26

support its assertions by "citing to particular parts of . . . the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see Celotex Corp.*, 477 U.S. at 324. Plaintiff has wholly failed in this respect. She proffers no evidence—nor even argument—demonstrating that Defendant terminated her employment in retaliation for conduct protected by the FLSA, REDA, or public policy of North Carolina.[2] Plaintiff may not merely rely on the allegations of her complaint to challenge a Rule 56 motion. *Reddy v. Buttar*, 38 F.4th 393, 403 (4th Cir.), *cert. denied*, 143 S. Ct. 364, 214 L. Ed. 2d 172 (2022) ("in establishing such a genuine dispute, the party opposing the motion must rely on more than 'conclusory allegations.'") (citation omitted).

Accordingly, Defendant's motion for summary judgment is GRANTED as to Plaintiff's second, third (retaliation only), fifth, and sixth claims for relief.

C.       Attorney's Fees under N.C.G.S. § 1-538.2

Defendant seeks summary judgment on an award of attorney's fees for prevailing on its counterclaim against Plaintiff under section 1-538.2(a) of the North Carolina General Statutes. The statute reads, in relevant part: "Any person . . . who commits an act that is punishable under G.S. 14-72, 14-72.1, 14-72.11, 14-74, 14-86.6, 14-86.7, 14-90, or 14-100 is liable for civil damages to the owner of the property." N.C.G.S. § 1-538.2(a). An "action may be brought under this section regardless of whether a criminal action is brought or a criminal conviction is obtained for the act alleged in the civil action." *Id.* § 1-538.2(c). "If successful, a property owner is entitled to the amount of any money lost by reason of the theft or embezzlement or fraud of an employee, as well as to any consequential damages, punitive damages, and reasonable attorneys' fees." *Caliber*

---

[2] Plaintiff alleges in the operative pleading that the protected activity on which she relies for these claims was her (unspecified) complaints about Defendant's wage payment practices. *See* Am. Compl. ¶¶ 2, 90, 108, 109, 115.

*Packaging & Equip., LLC v. Swaringen*, No. 22 CVS 3626, 2023 WL 3750076, at *3 (N.C. Super. May 31, 2023) (citing § 1-538.2(a)).

The court finds Defendant's request premature. Although the court has entered default against Plaintiff on the counterclaim as a sanction for her discovery conduct, the court has not entered judgment on the claim and has specifically ordered that "[t]he factfinder in this case will hear evidence regarding Defendant's request for damages and, therefore, discovery may proceed on such request." Order at 21, DE 73. The court explained that "Defendant will be . . . required to prove its damages, as Plaintiff has produced evidence appearing to support her argument that at least some gift cards were provided directly to HUD clients and/or used to purchase items for such clients." *Id.* at 19-20. The Fourth Circuit instructs that "[a] court may consider whether a fee award seems reasonable in light of the amount of damages awarded." *Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 676 (4th Cir. 2015). The reasonableness of a fee award may depend on other factors as well. *See id.* To ensure the court takes into consideration everything necessary to determine "reasonable" attorney's fees, the court will not determine any fee award in this case until all matters have been heard. Defendant's motion is DENIED WITHOUT PREJUDICE in this regard.

IV.     **Conclusion**

Based on the foregoing, Plaintiff's motion for partial summary judgment [DE 87] is DENIED and Defendant's motion for partial summary judgment [DE 83] is GRANTED IN PART,

DENIED IN PART, AND DENIED WITHOUT PREJUDICE IN PART.  This action will proceed

on Plaintiff's first, third (alleging non-payment of wages), and fourth claims for relief.

SO ORDERED this ___5th___ day of February, 2024.


RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE